Charles E. DONAHUE, Appellant,

v.

CONSOLIDATED RAIL CORPORATION.

No. 99–1637.

United States Court of Appeals, Third Circuit.

Argued April 11, 2000.

Filed Aug. 17, 2000.

Joseph M. Sellers, Paul T. Gallagher, (Argued), Cohen, Millstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Mark T. Wade, Jack Porter, Pierce, Raimond, Osterhout, Wade, Carlson & Coulter, P.C., Pittsburgh, PA, Counsel for Appellant.

C. Gregory Stewart, Phillip P. Sklover, Lorraine C. Davis, Lisa J. Banks, (Argued), Equal Employment Opportunity Commission, Office of General Counsel, Washington, DC, Counsel for Amicus Curiae in Support of Appellants.

Alan D. Berkowitz, (Argued), M. Francis Ryan, Jennifer S. Koether, Dechert Price and Rhoads, Philadelphia, PA, Counsel for Appellee.

Before NYGAARD, ALITO, and GIBSON, Circuit Judges.*

## OPINION OF THE COURT

ALITO, Circuit Judge:

Charles Donahue appeals from an order granting summary judgment to his former employer, Conrail, in a suit arising under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. We affirm.

### I.

Charles Donahue worked for many years on Conrail freight trains, primarily as a train conductor and engineer. In February 1993, Donahue had a heart attack at home. In May 1993, he returned to work. A few months later, in September 1993, Donahue passed out at work. His cardiologist, James Elson, concluded that Donahue's heart attack and blackout were caused by ventricular tachycardia, a heart condition that can suddenly cause the heart to beat extremely quickly. To help control this condition, Donahue had a defibrillator surgically installed. This device does not prevent the onset of tachycardia. Rather, it is designed to activate during tachycardic episodes and to shock the heart back into its normal rhythm. For the purposes of this appeal, it is undisputed that the device cannot be counted on to prevent loss of consciousness due to tachycardia.

After Donahue had undergone the surgery and several months of convalescence, Dr. Elson wrote a letter clearing him to begin working again. Nevertheless, Dr. Elson specifically warned Donahue that he remained at risk of passing out unexpectedly and that he should not work on or around moving trains. Despite his doctor's warnings, however, Donahue asked for work on moving trains. In March 1994, three days after beginning work as a train conductor, he experienced a tachycardic episode and passed out while walking down a train track. He was found by co-workers and taken to a hospital.

After recovering, Donahue asked his supervisors if there were any jobs that he could perform at Conrail in spite of his condition. The supervisors suggested several positions. He applied for at least one of these and was turned down because there were no vacancies. When he again asked his supervisors for advice, they suggested that he consider locomotive school but warned him that he would not be permitted to take any job at Conrail unless his doctor cleared him to work. Demoralized, Donahue decided to apply for Railroad Retirement Board disability benefits. He was granted full benefits and was terminated.

At the time Donahue left his job, Conrail had vacancies in the train dispatcher posi-

---

* The Hon. John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

tion.[1] The parties agree that a train dispatcher remotely monitors a stretch of railroad track and the trains on it. On hearing of a mishap, a train dispatcher must dispatch emergency crews to the scene and route traffic away. The dispatcher is also responsible for alerting both train crews and emergency crews about congestion or dangerous situations. A train dispatcher does not constantly control signals but must be prepared to do so if the need arises—as, for example, when an emergency call is received. At some times, especially when there is bad weather, there can be a constant stream of calls to a train dispatcher. Because dispatchers must be alert when they are on duty, and because the consequences of train wrecks can be severe, dispatchers are not allowed to work while under the influence of medications that might make them drowsy. Furthermore, train dispatchers are governed by strict federal regulations designed to insure that railroad employees who send train signals are alert. By regulating the hours that a train dispatcher can work, these regulations "promote the safety of employees and travelers on the railroads." 49 C.F.R. pt. 228, App. A.

In November 1998, Donahue sued Conrail under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 704. He alleged that Conrail had violated the Act by failing to provide a reasonable accommodation that would have allowed him to continue working. Specifically, Donahue alleged that Conrail had failed to accommodate him by offering to transfer him to a position he could perform.

Section 504(a) of the Rehabilitation Act, 29 U.S.C. § 794(a), provides in pertinent part as follows:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ... .

We have set out the elements of a claim under this provision as follows:

> To make out a prima facie case of discrimination under the Rehabilitation Act, the employee bears the burden of demonstrating (1) that he or she has a disability, (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job. The plaintiff must make a prima facie showing that reasonable accommodation is possible. If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would cause an undue hardship on the employer.

*Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996). The elements of a claim under § 504(a) of the Rehabilitation Act are very similar to the elements of a claim under Title I of the Americans with Disabilities Act, 104 Stat. 328, 42 U.S.C. § 12111 *et seq.*[2] *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir.1999) (elements of a claim under the ADA).

---

1. Donahue claims that there were also vacant positions in the position of "block operator." The train dispatcher and block operator positions, however, are very similar (The block operator simply works on a smaller scale.) The District Court held that a person who was not qualified to be a train dispatcher was also not qualified to be a block operator, and neither party has challenged that holding on appeal. Accordingly, we will refer to both positions as "train dispatcher" positions.

2. Section 504(d) of the Rehabilitation Act, 29 U.S.C. § 794(d) provides that "the standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990."

An employer's obligation to provide a reasonable accommodation does not require the employer to create a new job. *Mengine v. Runyon,* 114 F.3d 415, 417 (3d Cir.1997). However, an employer may be required to transfer an employee to an existing position. *Mengine,* 114 F.3d at 418; *Shiring,* 90 F.3d at 832. In such a failure-to-transfer case, the plaintiff bears the burden of demonstrating: (1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation. If the employee meets his burden, the employer must demonstrate that transferring the employee would cause unreasonable hardship. *Id.*

Donahue sued under the theory that, at the time of his termination, there were vacant positions at an appropriate level for which he was qualified. The District Court held, however, that a reasonable jury could not find based on the summary judgment record that there were any such positions, and the Court therefore granted summary judgment in favor of Conrail. Donahue appealed.

## II.

The principal question that we must decide in this appeal concerns Donahue's ability to perform the job of train dispatcher without posing a significant risk to others. Although Donahue argues that he could have performed the duties of several other positions without presenting any problems, the summary judgment record is insufficient to show that any of those other positions was vacant, funded, and "at an equivalent level or position as [his former job]." *Shiring,* 90 F.3d at 832.[3] We therefore focus on the job of train dispatcher.

Although both parties and their amici agree that Conrail was not required to make Donahue a train dispatcher if doing so would have created a "significant risk" to the health or safety of others, the two sides disagree about the allocation of the burden of proof on this issue.[4] Conrail and its amicus argue that Donahue, as part of his burden of proving that he was "qualified" for the train dispatcher position, was obligated to show that he would not present such a risk. By contrast, Donahue and the EEOC, relying chiefly on certain provisions of the Americans with Disabilities Act, maintain that Conrail bore the burden of proof on this issue.[5]

We find it unnecessary to decide this question. First, the argument that Conrail bore the burden of proof on this issue was never made to the District Court and was therefore waived. Second, even if we assume for the sake of argument that Conrail bore both the burden of production and the burden of persuasion on the issue of significant risk, we would still affirm the District Court's decision. As we will explain, no reasonable jury could fail to find that the evidence in the summary judg-

---

3. Donahue asserts that he could have been transferred to a position as a hump conductor, car retarder operator, switch tender, or clerical worker. He insists that was capable of performing the essential duties associated with these positions. However, Donahue has not pointed to evidence in the summary judgment record that there were vacant, funded spots at an appropriate level in any of those jobs.

   Donahue also argues that he should have been offered a transfer to the position of yardmaster. The District Court held that appointment as a yardmaster would have represented a promotion, and Donahue has not challenged that holding on appeal.

4. The Supreme Court used the term "significant risk" in *School Bd. Of Nassau County v. Arline,* 480 U.S. 273, 287 n. 16, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), observing that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate the risk." Congress later codified this holding. *See* 29 U.S.C. § 705(20)(D). The ADA uses the same term. *See* 42 U.S.C. § 12115, 12113(b).

5. *See* 42 U.S.C. § 12113(a) and (b).

ment record established that employing Donahue as a train dispatcher would have presented a significant risk to others.

In disability discrimination cases, courts must evaluate the significance of the risk that an employee would pose by considering four interrelated factors: the nature of the risk, the duration of the risk, the severity of the risk, and the probability that the potential harm will occur. *See, e.g., School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); *Nunes v. Wal–Mart Stores, Inc.,* 164 F.3d 1243, 1248 (9th Cir. 1999) (a court should consider the *Arline* factors when considering whether an employer is justified in not hiring an employee on the grounds that he would endanger others); *EEOC v. Amego,* 110 F.3d at 145 (1st Cir.1997) (same); *Estate of Mauro v. Borgess Med. Ctr.,* 137 F.3d 398, 402–03 (6th Cir.1998) (same). If the threatened harm is grievous, of course, even a small risk may be "significant." As another court of appeals recently noted:

> [I]t is the potential gravity of the harm that imbues certain odds with significance.... [W]e are far more likely to consider walking a tightrope to pose a significant risk if the rope is fifty feet off the ground than if it is one foot off the ground. This is so even if the odds of losing our balance are the same however far we have to fall.

*Onishea v. Hopper,* 171 F.3d 1289, 1297 (11th Cir.1999). Indeed, when an employee's disability potentially creates a risk of death for others, some courts have found that almost any risk is "significant." *See, e.g., Onishea,* 171 F.3d at 1297–99; *Estate of Mauro,* 137 F.3d at 407; *Doe v. Univ. of Maryland,* 50 F.3d 1261, 1264–65 (4th Cir. 1995); *Bradley v. University of Tex. M.D. Anderson Cancer Ctr.,* 3 F.3d 922, 924–25 (5th Cir.1993). Other courts have held that there must be some plausible risk of the event's occurring. *See, e.g., Abbott v. Bragdon,* 163 F.3d 87, 90 (1st Cir.1998) (plaintiff has produced evidence that there would be no significant threat, and employ-

er's countervailing evidence is "too speculative or too tangential" to support summary judgment) *aff'd in part, vacated and remanded in part,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Chalk v. United States Dist. Ct.,* 840 F.2d 701, 709 (9th Cir.1988) ("It was error to require that every theoretical possibility of harm be disproved."). In this case, we need not decide which of these approaches is correct. On the basis of the undisputed record evidence, it is clear that employing Donahue as a train dispatcher would have created a "significant risk" to others.

At the time when Donahue left Conrail, he had had one heart attack and had twice passed out at work in less than a year. Even after his defibrillator was installed, he passed out suddenly along a stretch of railroad track. The risk of his passing out unexpectedly was sufficiently high that his own cardiologist refused to clear him to work near trains where he might injure himself by passing out unexpectedly. *See* App. at A–514. The same doctor stated in his deposition that, at the time when Donahue was dismissed, he should not have been permitted to perform tasks that required him to be "conscious and alert" in case of emergencies. *See* App. at 512a.

A train dispatcher must be conscious and alert. The train dispatcher's job involves monitoring railroad track to insure that trains move without mishap. The dispatcher must be alert and ready to communicate with trains quickly as soon as an emergency arises—keeping other trains from entering the area and getting emergency crews to the scene. *See* App. at 529. If a train dispatcher passes out on the job, railroad employees and others could be injured or killed. For this reason, the federal government regulates the hours that train dispatchers may work, and Conrail enforces strict guidelines involving the medications that train dispatchers may use on the job. In upholding federal regulations allowing for the drug testing of railway employees such as train dispatchers, the Supreme Court

wrote: "Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," among which are "great human loss." *Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 628, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

■ In spite of all this, Donahue contends that a reasonable person could consider it safe for him to work as a train dispatcher. Donahue argues that it is not important for every dispatcher to be conscious at all times because several dispatchers work together in the same room. According to Donahue, Conrail could have eliminated the danger posed by his losing consciousness by instructing co-workers to watch him and, if necessary, to take over his duties. *See* App. at 531. We reject this argument.

■ To begin, it is not clear that Donahue's proposal can properly be characterized as an "accommodation." An employee can succeed under the Rehabilitation Act only if the employee can "demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job." *Taylor*, 184 F.3d at 319. Thus, employers are not required to modify the essential functions of a job in order to accommodate an employee. The ability to monitor the tracks is an essential function (indeed *the essential* function) of the train dispatcher's job, and Conrail is not required to hire any employees who cannot perform this function. Donahue's suggestion that someone could "cover" for him is thus not an accommodation designed to help him perform an essential duty of the job. Rather, it is a request to be *exempted* from an essential duty.

Furthermore, the record evidence before the District Court demonstrates that this "accommodation" would not have eliminated the significant risk that Donahue would have posed. Although the record shows that workers occasionally fill in for each other during short breaks, it also shows that there are times, such as periods of bad weather, when emergencies occur with great frequency, and during such times, train dispatchers must work straight through their shifts. *See* App. at 530, 532. Since Donahue's fainting spells are entirely unexpected, they might occur when no one is available to "cover" for him. Furthermore, Donahue's fainting spells are of indeterminate length, and during these times, he is not merely unable to work, but is in need of medical attention and thus may disrupt the work of others. For all these reasons, a short break taken by an employee after notifying co-workers and verifying that they can cover for him or her is not comparable to a sudden and unexpected loss of consciousness.

Donahue also argues that the fact that he has not passed out since 1993 shows that he did not present a "significant risk." When evaluating Conrail's refusal to permit Donahue to work as a train dispatcher, however, we must consider the evidence available when Conrail made that decision, not what is known with the benefit of hindsight. When Conrail made its decision, it knew that Donahue had twice passed out at work, and Donahue's own cardiologist had opined that Donahue was at risk of passing out unexpectedly.

On the evidence in the record, a reasonable factfinder could only conclude that Donahue would have posed a significant risk to others if he had been employed as a train dispatcher—even with reasonable accommodations.

### III.

■ Donahue argues that the decision of the District Court should nevertheless be reversed because Conrail failed to engage in good faith in an "interactive process" designed to find a job to which he could have been transferred. We disagree.

Our seminal case regarding an employer's obligation to engage in the interactive process is *Mengine v. Runyon, supra.* There, after concluding that Mengine had not identified "any available permanent jobs which he was capable of performing," we addressed his argument that summary judgment should not have been granted in favor of his employer, the Postal Service, because the Postal Service had "failed to cooperate with his efforts to investigate job descriptions and job vacancies." *Id.* at 419. We noted that, under a recent decision of the Seventh Circuit [6] and a regulation promulgated under the ADA,[7] employers and employees were admonished to seek an " 'appropriate reasonable accommodation' " through " 'a flexible interactive process.' " *Id.* (quoting 29 C.F.R. § 1630.2(*o*)(3)(1995)). We also expounded on the benefits of this approach:

> When the interactive process works well, it furthers the purposes of the Rehabilitation Act and the ADA. The employers will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities, especially in a large company. Thus, the interactive process may often lead to the identification of a suitable position. If it turns out there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA or Rehabilitation Act violation.

114 F.3d at 420. *See also Jones v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000).

At the same time, however, we left no doubt that " 'it falls to the employee to make at least a facial showing' that there were vacant, funded positions whose essential functions he was capable of performing." *Id.* at 418 (quoting *Shiring*, 90 F.3d at 832). *See also Mengine*, 114 F.3d at 418. We wrote: "Mengine must 'demonstrate that there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position as [his former job].' " (quoting *Shiring*, 90 F.3d at 832). We also noted the consequences borne by an employer that fails to engage in the "interactive process": "if an employer fails to engage in the interactive process, it may not discover a way in which the employee's disability could have been reasonably accommodated, thereby risking violation of the Rehabilitation Act." *Id.* at 420–421.[8] And we quoted the Eleventh Circuit's observation that "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir.1997).

*Mengine's* treatment of the issue of the interactive process was dictated by the Rehabilitation Act and well established standards regarding summary judgment. The Rehabilitation Act creates a claim on behalf of an "otherwise qualified individual with a disability" who is subjected to discriminatory treatment solely by reason of his or her disability, 29 U.S.C. § 794(a), and an employer's refusal to

---

**6.** *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996).

**7.** 29 C.F.R. § 1630.2(*o*)(3)(1995).

**8.** Similarly, sitting en banc in *Deane v. Pocono Med. Ctr.*, we noted:

> Although not a ground of our decision, we take this opportunity to observe that this protracted (and very much ongoing) litigation would likely have been unnecessary had the parties taken seriously the precepts announced in our opinion in *Mengine v. Runyon* . . . . While it may turn out that reasonable accommodation for Deane is impossible, . . . nevertheless, *an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA.*

142 F.3d 138, 149 (3d Cir.1998)(emphasis added) (internal citations omitted).

make "reasonable accommodation" constitutes discrimination. *See Shiring* 90 F.3d at 832. A transfer to an appropriate vacant position may be a reasonable accommodation. *See id., Mengine,* 114 F.3d at 417, but the burden of proving discrimination, and thus the burden of proving that there was an appropriate vacant position, falls on the plaintiff. *Id.* at 417, 418; *Shiring,* 90 F.3d at 832.

If the defendant in a failure-to-transfer Rehabilitation Act case moves for summary judgment on the ground that the plaintiff has not identified any appropriate vacant position to which the plaintiff could have been transferred, the plaintiff may move for a continuance to permit discovery regarding such positions. *See* Fed. R. Civ. Proc. 56(f). But after a full opportunity for discovery, a motion for summary judgment must be granted if the summary judgment record is insufficient to support a judgment in favor of the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Consequently, in a failure-to-transfer case, if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant—even if it also appears that the defendant failed to engage in good faith in the interactive process.

Other courts of appeals have endorsed this approach. *See, e.g., Jackan v. New York State Dept. of Labor,* 205 F.3d 562, 567 (2d Cir.2000) (granting summary judgment to a defendant in an ADA suit where the plaintiff pleaded that his employer had failed to engage in the interactive process because it was the plaintiff who had the burden "to persuade a jury that an accommodation exists that permits her to perform the job's essential functions.") *See also id.* at 567 n. 4 ("Jackan suggests that placing the burden on the plaintiff to prove the existence of a vacancy is unfair, given

the employer's greater access to this information. This concern is over-stated. Once the litigation has begun, the plaintiff can utilize the liberal discovery procedures of the Federal Rules of Civil Procedure, including interrogatories, depositions, and document demands, to identify vacancies that existed at the pertinent time."); *Smith v. Midland Brake Inc.,* 180 F.3d 1154, 1174 (10th Cir.1999) (en banc) ("Even if Midland Brake failed to fulfill its interactive obligations to help secure a reassignment position, Smith will not be entitled to recovery unless he can also show that a reasonable accommodation was possible and would have led to a reassignment position."); *Willis v. Conopco, Inc.,* 108 F.3d 282, 285 (11th Cir.1997) (holding that the employer's failure to interact with the employee does not preclude the employee from losing on summary judgment because the employee must still prove that a reasonable accommodation could have been made); *Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 448 (11th Cir.1996) (same); *cf. Broussard v. University of California,* 192 F.3d 1252, 1259 (9th Cir.1999) ("Any failure by the University to engage in an interactive process with Broussard is negated by the fact that she is not disabled under the terms of the ADA.").

Relying on certain statements in our opinion in *Taylor,* 184 F.3d at 296, Donahue argues that Conrail's failure to engage in good faith in the interactive process was alone sufficient to defeat summary judgment and might even give rise to an independent cause of action. Donahue misinterprets *Taylor.* The *Taylor* panel was bound by and followed *Mengine.* Like *Mengine, Taylor* made it clear that the plaintiff in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible. *Taylor* unequivocally stated that "because employers have a duty to help the disabled employee devise accommodations, an employer who acts in

bad faith in the interactive process will be liable *if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations.*" 184 F.3d at 317. *Taylor* added:

> [A]s we explained in *Mengine*, "The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." *Mengine*, 114 F.3d at 420 (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)).

*Id.*

Donahue relies, however, on the following passage from the next page of the *Taylor* opinion:

> When an employee has evidence that the employer did not act in good faith in the interactive process ... we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect. To assume that accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process.... [W]here there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded.

*Id.* at 318.

When this passage and the statements quoted earlier are read in context, they are entirely consistent. *Taylor* was a case in which the plaintiff, a secretary suffering from a mental illness, sought accommodations relating to the job that she had held for years. *See* 184 F.3d at 315. Among the possible accommodations were the following: "the school district could have increased Taylor's job responsibilities more slowly, given more time to introduce the computer, or communicated less by formal, written reprimands." *Id.* at 318. These possible accommodations involved questions of degree—how quickly Taylor's job responsibilities would be increased, how soon would she be expected to use a computer, and to what extent would formal written reprimands be employed. Under these circumstances, the number of possible "packages" of accommodations was undoubtedly large. In order to recover, Taylor had to show that her employer discriminated against her by failing to make *some* reasonable accommodation for her disability, but nothing in the ADA required her to show precisely which package of accommodations her employer should have made. Thus, in this context, where a universe of potential accommodations has been identified, if the employer refuses in bad faith to engage in the interactive process, "we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect." *Taylor*, 184 F.3d at 318. This proposition, however, cannot aid a plaintiff such as Donahue who, after the opportunity for discovery regarding available positions, could not identify any vacant, funded position, at the appropriate level, that he could have performed without presenting a significant safety risk.

### IV.

For these reasons, we affirm the decision of the District Court.