Anthony S. **SWIERKOWSKI**, Plaintiff,

v.

**CONSOLIDATED RAIL CORPORATION,**
Defendant.

No. CIV. A. 99–2806.

United States District Court,
E.D. Pennsylvania.

April 3, 2001.

Mark T. Coulter, Mark T. Wade, Robert Pierce and Associates, Pittsburgh, PA, Joseph M. Sellers, Paul T. Gallagher, Deborah J. Vagins, Cohen, Milstein, Hausfeld and Toll, Washington, DC, for Plaintiff.

M. Frances Ryan, Andrea M. Cardamone, Dechert, Price & Rhoads, Philadelphia, PA, for Defendant.

## MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

On June 2, 1999, plaintiff filed a Complaint against the defendant alleging violations of the Americans with Disabilities Act of 1990, as amended, ("ADA"), 42 U.S.C. § 12101, et seq., and § 504 of the Rehabilitation Act of 1973, as amended, ("Rehabilitation Act"), 29 U.S.C. § 794, et seq., seeking declaratory, injunctive and compensatory relief for denial of employment on the basis of disability and denial of a reasonable accommodation by defendant. On March 30, 2000, the Court dismissed plaintiff's ADA claims for failure to exhaust administrative remedies, but allowed the Rehabilitation Act claims to proceed.

Presently before the Court is Defendant's Motion for Summary Judgment (Document No. 16, filed July 17, 2000), Plaintiff's Opposition to Conrail's Motion for Summary Judgment (Document No. 19, filed August 21, 2000), and Defendant's Reply Brief in Support of Its Motion for Summary Judgment (Document No. 20, filed August 25, 2000). For the reasons set forth below, the motion will be denied.

## II. FACTS

Plaintiff, born in 1949, began working for the Penn Central Railroad, predecessor of Conrail, in 1974, after spending four years in the Navy. He has a high school education. Pl.'s Dep., June 29, 2000 ("Ex.P-1"), pp. 10–12. From 1974 until April 1993, plaintiff worked in a variety of positions, including jitney driver, janitor, timekeeper (payroll clerk), trailvan clerk, crew dispatcher, and messenger, mostly in Buffalo, New York. These positions were within the jurisdiction of the clerical craft, and plaintiff belonged to the clerical union. Ex. P-1, pp. 12–25. During this period, plaintiff was periodically out of work due to furloughs. Ex. P-1, pp. 28–29.

In early 1993, Conrail began the process of transferring most of its clerical workers to its Philadelphia headquarters. Ex. P-1, p. 30. In April 1993, plaintiff, along with 30 other clerical employees, was again furloughed. Ex. P-1, pp. 36–37. Having learned that there were not going to be any more jobs in the clerical craft in Buffalo, and wanting to stay in the area, plaintiff decided to transfer to the trainman craft in May, 1993. Trainmen are members of a different union, the United Transportation

Union ("UTU"), and as a result of his transfer, plaintiff had to relinquish all of his seniority rights in the clerical union. Ex. P–1, p. 41; UTU Letter of Jan. 27, 1995 ("Ex.D–G"). Work assignments were made on a seniority basis—workers bid for available jobs, and they are assigned on the basis of seniority. Employees with more seniority may "bump" an employee with less seniority for a given job. Jobs are placed for bid when a position becomes vacant—when a job holder retires, quits or is disabled, or when the person holding the job chooses to exercise his seniority to take another position. Decl. of Lawrence Dellinger ("Ex.D–B"), ¶¶ 19, 21. After the transfer to the trainman craft, plaintiff essentially started over as a new hire with a trainman seniority date of May 25, 1993. Ex. P–1, p. 52.

The terms "trainman" and "trainman craft" encompass a variety of positions: brakeman, conductor, switch tender, hump conductor and car retarder operator. Dep. of Lawrence J. Finnegan, Aug. 16, 2000 ("Ex.P–5"), p. 21; Ex. D–B, ¶ 4. Brakeman and conductor positions are considered "heavy duty" or "physically demanding." Ex. P–1, pp. 45–47. Ex. D–B, ¶ 5. The responsibilities of these positions include coupling and uncoupling trains, clearing tracks, throwing switches and bringing out loads. They must also lift knuckles weighing about 30 or 40 pounds. Ex. P–1, pp. 44–46. Of all trainman positions, only three can be characterized as sedentary: hump conductor, car retarder operator, and switch tender. Ex. D–B, ¶ 6.

In his initial physical examination, in 1974, Penn Central's medical personnel diagnosed plaintiff with scoliosis, a diagnosis which was reconfirmed in a 1994 examina-tion. Penn Central X–Ray Report ("Ex.P–2"); Letter from Dr. Capicotto to Dr. McMahon, Apr. 19, 1994 ("Ex.P–3"). Scoliosis is a lateral curvature of the spine. *Webster's New Universal Unabridged Dictionary*, 1624 (Deluxe 2d Ed.1983).

Plaintiff began training as a brakeman/conductor on May 25, 1993. Ex. P–1, p. 52. During the course of this training, plaintiff discovered that the physical requirements of his new job, including climbing ladders, walking on uneven pavement and carrying heavy materials, aggravated his pre-existing back condition. Ex. P–1, pp. 45–46, 60–61. On September 8 or 9, 1993, plaintiff called Conrail and requested a medical examination as a result of his back pain. Ex. P–1, pp 53–54. Defendant immediately disqualified plaintiff from service, without pay, and soon thereafter, on September 20, 1993, a Conrail fee-for-service physician, Dr. G. Baley, conducted a medical examination of defendant. Ex. P–1, pp. 58–59.

As a result of the examination by Dr. Baley, plaintiff was medically disqualified from returning to his job as a brakeman/conductor. Ex. P–1, p. 60. Dr. Baley told plaintiff that he could not engage in work requiring heavy lifting and placing excessive physical demands on his back. The doctor also recommended that plaintiff be employed only in sedentary jobs. Ex. P–1, pp. 62–64; Medical Status Report of Sept. 20, 1993, signed by Dr. Baley ("Ex.P–6").

Dr. Orwest Hawryluk, identified by plaintiff as Conrail's Medical Director,[1] confirmed Dr. Baley's assessment on October 1, 1993, disqualified plaintiff from his current job, and recommended that he be "consider[ed] for alternate placement."

---

1. It should be noted that in a letter dated January 27, 1995, Dr. Nowosiwski is identified as Medical Director. Ex. D–G. It ap-pears that some time between October 1, 1993 and January 27, 1995, Dr. Nowosiwski assumed the position of Medical Director.

Medical Status Report of Oct. 1, 1993, signed by Dr. Hawryluk ("Ex.P–7"). Subsequently, plaintiff visited his personal physician, Dr. William McMahon, who confirmed the previous diagnosis and the job restrictions. Ex. P–1, pp. 81–82. Dr. McMahon referred plaintiff to a back specialist, Dr. William H. Capicotto, who examined plaintiff on April 18, 1994. Ex. P–1, pp. 95–96. Dr. Capicotto confirmed that plaintiff was suffering from "a lower back condition" and was "no longer fit to perform duties as a trainman." Letter from Dr. Capicotto to plaintiff, Apr. 19, 1994 ("Ex.D–E").

Before plaintiff's first physical examination, when he informed his supervisor, Robert Husted, of his injury, he was told "I got to pull you out of service," meaning plaintiff would be unable to work pending the outcome of the physical examination. Ex. P–1, pp. 66–69. After plaintiff's first physical examination, he informed his supervisor of the limitations Dr. Baley placed on him, and then applied for, and received, benefits from the Railroad Retirement Board. Ex. P–1, pp. 70–77.

As of September 1993, plaintiff was physically unable and medically disqualified from performing all but sedentary trainman jobs. Ex P–1, pp. 63–64. In 1994, plaintiff contacted Conrail's labor relations department about finding a suitable placement. Ex. P–1, pp. 79–80. He also contacted his trainman and clerk's union representatives to inquire about available work. Ex. P–1, pp. 98–99. He tried to return to his previous job as a clerk, but was told that he would be unable to do so because he had resigned his seniority in the clerk's union when he became a trainman. Letter from Mr. Finnegan to plaintiff, June 13, 1994 ("Ex.P–9").

In Conrail's Frontier Yard, where plaintiff was employed, work assignments were posted in an office. Employees may bid on those jobs, and are awarded jobs on the basis of seniority. In the eighteen-month period during which plaintiff was unemployed, he never went to the rail yard to see if there were any jobs for which he could bid. Ex. P–1, p. 164.

On June 9, 1994, Conrail contacted plaintiff about two potential vacancies for which he was qualified—bridge operator and yardmaster. Ex. P–1, pp. 109–115. However, these jobs, located in Selkirk, New York, near Albany, and in West Springfield, Massachusetts, respectively, were both well over 300 miles away from his home in Springville, New York, a suburb of Buffalo. Plaintiff testified that he did not want either of these jobs, in part because he did not want to be so far from his family. Ex. P–1, p. 115.

On January 27, 1995, Lynn Powell, the Local Chairman of UTU, wrote to defendant, enclosing a letter from Dr. Capicotto, one of plaintiff's doctors, clearing plaintiff to return to light duty work, and identifying two available switch tender positions. A copy of this letter was also sent to plaintiff, informing him of the available positions. Ex. P–1, pp. 121–124; Ex. D–G. Plaintiff bid on and accepted one of these jobs, and eventually returned to work in March 1995 as a switch tender, a sedentary position in the trainman craft. He remained a Conrail employee in that job until the part of the railroad on which he worked was purchased by CSX Corporation ("CSX"), and he is currently employed by CSX.

Plaintiff claims that when he returned to work, he discovered that six Conrail employees with less seniority had been working in positions for which he was eligible during his absence—the positions of switchtender, car retarder operator, and hump conductor. Ex. P–1, pp. 175–77. Plaintiff identified those six employees as Ted Doremeyer, Brian Draves, Jimmy

Smith, Barry Simpson, Tom Curran and Joe Geratono. He testified that he knew those individuals had less seniority because he saw the roster list with their seniority order in the Frontier Yard. According to plaintiff, because of his disability, he should have been notified of those positions, given an opportunity to bid on them, and, if qualified, "bump" the employee with less seniority in the position he chose. Ex. P–1, pp. 145–58.

## III. STANDARD OF REVIEW

"If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]" summary judgment shall be granted. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that Rule 56(c) requires "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "a motion for summary judgment must be granted unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (citing *Anderson* and *Celotex Corp.*).

In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quoting *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, "[i]f the evidence [offered by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). On the other hand, if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact, summary judgment should not be granted.

## IV. DISCUSSION

■ Defendant makes two arguments in support of its summary judgment motion: (1) that plaintiff's claims are barred by the statute of limitations, and (2) that plaintiff's Rehabilitation Act claim fails on the merits. The Court will address these arguments in turn.

### A. Plaintiff's Claims Are Not Barred by the Statute of Limitations.

Defendant argues that plaintiff's claims are barred by the applicable statute of limitations. It asserts that the relevant statute of limitations, two years, began to run in March, 1995, when the plaintiff returned to work, but was tolled during the pendency of a class action suit.

The Rehabilitation Act of 1973 contains no statute of limitations. Therefore, a federal court must apply the limitations period from the most analogous cause of action in the forum state. *See Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985). Pennsylvania's two

year statute of limitations for personal injury claims governs claims under the Rehabilitation Act. *See Toney v. U.S. Healthcare, Inc.,* 840 F.Supp. 357, 360 (E.D.Pa.1993).

■ It is well settled that the filing of a class action tolls the running of the statute of limitations otherwise applicable to all class members in their individual capacities. *See Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 2397–98, 76 L.Ed.2d 628 (1983); *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553–54, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974); *Bailey v. Sullivan,* 885 F.2d 52, 65 (3d Cir.1989). The statute remains tolled until class certification is denied. *See Crown, Cork & Seal,* 462 U.S. at 354, 103 S.Ct. at 2397–98.

Plaintiff was part of a class certified in the Western District of Pennsylvania. *See Mandichak, et al. v. Consolidated Rail Corp.,* Civ. Act. No. 94–1701 (W.D.Pa. 1998). On October 24, 1996, the *Mandichak* Court certified two classes, one of which plaintiff was a member—"All current and former Conrail employees and job applicants who have received offers of employment, who, during the period of July 25, 1992, until the date of verdict, have been denied employment or other employment benefits by Conrail because of their disabilities despite being qualified to perform the essential functions of the specific job desired." This class was granted for injunctive relief only, and "denied as to any claims for monetary damages." Order of October 24, 1996. The class was ultimately decertified on August 20, 1998 "without prejudice to the right of any plaintiff, or any other employee, to assert individual claims against Conrail under the ADA [or] the Rehabilitation Act." *See Freed v. Consolidated Rail Corp.,* 201 F.3d 188, 190 (3d Cir.2000).

Defendant argues that the statute of limitations for plaintiff's damages claims began running on October 24, 1996, when the *Mandichak* Court denied class certification as to any claims for monetary damages. According to defendant, since the Complaint in this case was filed on June 1, 1999, more than two years after October 24, 1996, plaintiff's case is time-barred.

In contrast, plaintiff argues that the statute of limitations began running on August 20, 1998, when the *Mandichak* class was ultimately decertified. If the Court adopts the August 20, 1998 date, the limitations period for filing would extend well past the date plaintiff filed the Complaint, and consequently, the action would not be barred by the statute of limitations.

Defendant cites two cases to support its assertion—*Nelson v. County of Allegheny,* 60 F.3d 1010 (3d Cir.1995) and *Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374 (11th Cir.1998). In *Nelson,* where individual claims were brought after the denial of certification of a class action, the Third Circuit held that the statute of limitations is not tolled during the appeal of the denial of certification, in contrast to the Pennsylvania rule for cases in state court. *See Nelson,* 60 F.3d at 1013. *Armstrong* is a case in which the court certified a class narrower than originally requested. In that instance, the 11th Circuit held that since the narrowed class did not include the plaintiffs, the tolling of the statute of limitations for those plaintiffs ceased with the certification of the class. *See Armstrong,* 138 F.3d at 1380–81 & n. 10.

The holding in *Nelson* is simply inapplicable to plaintiff's claim. *Nelson* dealt with tolling during an appeal from denial of class certification, whereas there is no such appeal in the present case. *Armstrong* is easily distinguished from plaintiff's case. There, the class was narrowed so as to exclude the plaintiffs completely.

In the present case, the plaintiff was included in the *Mandichak* class, although his claim for damages was excluded from that class.

A rule which permits the limitations period to run on the class members' damages claim after certification while tolling claims for injunctive relief could potentially result in confusion and prejudice to class members. Had the *Mandichak* class action been resolved in favor of the plaintiff class and a pattern and practice of discrimination been found, individuals similarly situated to plaintiff in this case would have been able to rely on that finding in seeking damages. Creating a rule which would require individual plaintiffs to litigate their damages claims while a class action seeking injunctive relief for an alleged pattern or practice of discrimination was pending would run completely counter to the efficiency rationale of the class action by having two suits covering essentially the same claim running at the same time. *See Crown, Cork & Seal Co., Inc.,* 462 U.S. at 350, 103 S.Ct. at 2396 ("The principal purposes of the class action procedure [are] promotion of efficiency and economy of litigation . . . ."). Therefore, the Court holds that the statute of limitations was tolled for the damages claims during the pendency of the *Mandichak* class, and plaintiff's action was timely filed.

**B. Plaintiff's Rehabilitation Act Claims**

To establish a prima facie case of discrimination under the Rehabilitation Act, the employee bears the burden of demonstrating "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." *Donahue v. Consolidated Rail Corp.,* 224 F.3d 226, 229 (3d Cir.2000) (quoting *Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir. 1996)).[2]

Defendant asserts that plaintiff's Rehabilitation Act claim must fail on the merits. To support this assertion, it argues that plaintiff is not disabled within the meaning of the Rehabilitation Act, and that plaintiff is not a qualified individual with a disability. The Court will address these arguments in turn.

1. *Plaintiff's Disability Under the Rehabilitation Act*

■ The first element of a prima facie case under the Rehabilitation Act requires a plaintiff to establish that he or she has a disability. An employee is disabled if he has "a physical or mental impairment that substantively limits one of more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2000). When considering whether a person is substantially limited in a major life activity, the following factors should be considered: "(i) [t]he nature and severity of the impairment; (ii)[t]he dura-

---

**2.** Section 504(d) of the Rehabilitation Act provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990." 29 U.S.C. § 794(d). *See Donahue,* 224 F.3d at 229 & n. 2 ("The elements of a claim under § 504(a) of the Rehabilitation Act are very similar to the elements of a claim under Title I of the [ADA]"); *McDonald v. Pennsylvania Dep't of Pub. Welfare, Polk Center,* 62 F.3d 92, 94 (3d Cir.1995) ("Congress made clear its intention that identical standards were to be applied to both Acts.").

tion or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2) (2000).

Plaintiff asserts that he is disabled under the law because his back condition substantially limits the major life activity of "working." When determining whether a person is substantially limited in the ability to work, the Court must inquire "whether the individual is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Mondzelewski v. Pathmark Stores, Inc.,* 162 F.3d 778, 784 (3d Cir.1998) (quoting 29. C.F.R. § 1630.2(j)(3)(i)). Further, when determining whether the person's major life activity of working has been substantially limited, the Court must consider:

(A) [t]he geographical area to which the individual has reasonable access; (B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or (C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii) (2000). This assessment must be made on an individualized, case by case basis. *See Mondzelewski,* 162 F.3d at 784.

Defendant first argues that plaintiff cannot be considered disabled under the Rehabilitation Act on the ground that he is not substantially in the major life activity of working. It is defendant's position that the inability to perform a single, particular job, does not constitute a substantial limitation in the major life activity of working. *See* 29 C.F.R. § 1630(j)(3)(i); *Balls v. AT & T Corp.,* 28 F.Supp.2d 970, 975 (E.D.Pa. 1998). That is a correct statement of the law for it is only significant restriction in the ability to perform a class of jobs or a broad range of jobs in various classes, as compared to the average person having comparable training, skills and abilities, that is actionable under the Rehabilitation Act. However, the Court concludes that plaintiff has presented evidence to support his contention that he is unable to perform a broad range of jobs.

Several doctors have opined that plaintiff was unable to perform any work other than that which is sedentary, or light duty. Dep. of William Capicotto, June 13, 2000 ("Ex.D–D"), p. 29. In addition, Dr. Capicotto stated that plaintiff had a "permanent disability" with respect to his lower back. Ex D–D, p. 48; Dep. of William Capicotto, June 13, 2000 ("Ex.P–8"), pp. 31–32. Secondly, plaintiff presented the opinion of Joseph R. Spoonster, M.S., V.E., a vocational rehabilitation expert, that only "10.96% of the occupational titles described in the *Dictionary of Occupational Titles* fall in the sedentary or "light duty" classification." Spoonster Opinion Letter, June 1, 2000 ("Ex.P–11").

Defendant also argues that plaintiff cannot prevail on his Rehabilitation Act claim because he presented no demographic evidence describing the jobs in his geographic region from which he was excluded. Several district courts have held that "a plaintiff must present demographic evidence to

show from what jobs in [his] geographic area plaintiff has been excluded due to [his] disability. A plaintiff's failure to do so is fatal at summary judgment." *Balls,* 28 F.Supp.2d at 975 (citing *Taylor v. Phoenixville School Dist.,* 998 F.Supp. 561, 568 (E.D.Pa.1998) (*rev'd* 174 F.3d 142 (3d Cir. 1999))). In *Balls,* an employment discrimination case brought under the ADA, the plaintiff presented no evidence regarding opportunities in her geographic area, nor did she argue that she was unable to perform a broad range of jobs. *Id.* The *Balls* court held that "[w]ithout evidence that her condition precluded her from performing a broad range of jobs, plaintiff cannot make out the disability element of her prima facie case." *Id.*

In this case, plaintiff presented sufficient demographic evidence to survive summary judgment—evidence that shows there were no available sedentary trainman positions for which he had sufficient seniority in the Buffalo area at Conrail. Ex. P–1, p. 123. This evidence leads the Court to conclude plaintiff has met his burden of demonstrating the jobs from which he was excluded in his geographic area.

The Court holds that plaintiff has met his burden of presenting evidence of a disability that substantially limited the major life activity of working because he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." Thus plaintiff has satisfied the first prong of a prima facie case under the Rehabilitation Act.

### 2. *Plaintiff as a Qualified Individual With A Disability Under the Rehabilitation Act*

The second prong of a prima facie case under the Rehabilitation Act requires plaintiff to establish that he "is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer." *Donahue,* 224 F.3d at 229. Defendant asserts that plaintiff has presented no evidence that he was able, with or without a reasonable accommodation, to perform the essential functions of an available job. Plaintiff argues that despite his attempts to obtain an accommodation, Conrail failed to fulfill its legal obligation to engage in the interactive process.

"To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3)(2000). The interactive process serves the interests of both employer and employee—employers will not always know what sort of restrictions the disability imposes on the employee, and similarly, employees will not always be aware of various employment opportunities within a company. *See Donahue,* 224 F.3d at 233 (quoting *Mengine v. Runyon,* 114 F.3d 415, 420 (3d Cir.1997)). The interactive process can very well lead to the identification of a position that fits the needs of the disabled employee. "If it turns out there is no job which the worker (with or without accommodation) is capable of performing, then the company cannot be held liable for an ADA or Rehabilitation Act violation." *Id.*

Plaintiff does not argue that he was entitled to an accommodation that would enable him to perform the essential func-

tions of a non-sedentary trainman, such as a brakeman/conductor. On this issue plaintiff admits his medical condition prevented him from returning to Conrail as a brakeman/conductor. Ex. P–1, pp. 60, 63–64, 72; Ex. D–D, p. 48. Instead, plaintiff argues he was clearly restricted to, and clearly sought, only sedentary work at Conrail. Ex. P–1, pp. 63, 97, 134, 164. Plaintiff's previous job, as a brakeman/conductor, cannot be classified as sedentary, and, he admits, no accommodation can make it so. Ex. P–1, pp. 215–16. As he testified, that job was clearly not "light duty" and involved a number of physical activities, such as walking on uneven ground and lifting, which he was unable to do so. Ex. P–1, pp. 46–47, 60, 72.

Plaintiff's main arguments with respect to this element of a prima facie case under the Rehabilitation Act are as follows: 1) Conrail has an obligation to engage in the interactive process, 2) plaintiff initiated and participated in the interactive process, 3) Conrail failed to engage in the interactive process, and 4) that alternative positions were available.

In its Motion for Summary Judgment, Conrail argues that plaintiff has failed to participate in the interactive process and has not presented evidence that, between September 1993 and January 1995, at his seniority level or lower, a vacant switch tender, car retarder operator, or hump conductor position for which he was qualified was available. Conrail also argues that, contrary to plaintiff's position, there is no evidence that it acted in bad faith in the interactive process.

The parties have presented a great deal of evidence on the interactive process. Plaintiff notified defendant of his disability and his request for accommodation. Plaintiff also testified that during some portion of the 18 month period he was out of work, he called Mr. Finnegan at defendant's La-bor Relations Department on a weekly basis seeking a sedentary position, although he could not say how many times he called Mr. Finnegan. Ex. P–1, pp. 161–62. Contrary to defendant's argument, plaintiff identified six less senior employees who obtained positions plaintiff says he could have filled during that eighteen-month time period. To counter this evidence, defendant points to the fact, among others, that plaintiff never visited the Frontier Yard during the eighteen months he was out of work in order to determine what available positions were posted. It is that evidence on which defendant principally relies in seeking summary judgment.

The Court sees no useful purpose in summarizing all of the evidence on the question of each party's participation in the interactive process. Suffice it to say, that, considering all of the evidence on this issue, the parties have raised genuine issues of material fact. Thus, summary judgment is inappropriate.

## V. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment will be denied.