**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1735
_____

PAUL ANDERSON,

Appellant

v.

NORFOLK SOUTHERN RAILWAY COMPANY

_____

On Appeal from the United States District Court for the
Western District of Pennsylvania
(District Court No. 3:18-cv-00190)
District Court Judge: Honorable Kim R. Gibson
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 11, 2022

(Filed: April 11, 2022)

Before: GREENAWAY, JR., SCIRICA, and RENDELL, *Circuit Judges*.

_____

O P I N I O N*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**RENDELL**, *Circuit Judge.*

Plaintiff-Appellant Paul Anderson challenges the District Court's grant of summary judgment for Defendant-Appellee Norfolk Southern Railway Co. ("NSRC") in this employment discrimination action. For the reasons that follow, we will affirm.

I.

On September 17, 2007, Anderson was hired as a Conductor Trainee in NSRC's Pittsburgh Division. On February 17, 2008, he was promoted to Conductor and, on April 21, 2015, he was promoted to Locomotive Engineer. His job duties consisted of the safe and proper management of freight trains, which often pass at speed through densely populated areas and may carry hazardous cargo. His duties also entailed driving the trains, working near moving machinery, and carrying equipment.

Unsurprisingly, the Federal Railroad Administration considers the positions of conductor and engineer to be "safety-sensitive," 49 C.F.R. § 219.5; 49 U.S.C. § 21101. Performance in either position implicates the safety of both the public and fellow railway workers. An engineer, while operating a locomotive, must remain alert, "monitor[] various gauges and meters . . . and mov[e] engine controls." JA 0108. A conductor's responsibilities include, *inter alia*, coupling and uncoupling train cars, calling signals, using hand brakes, and making on-the-spot repairs.

In June 2016, Anderson took a medical leave of absence after suffering several unexplained falls —what turned out to be "syncopal episodes"—resulting in loss of consciousness, head injuries, and hospitalization. Anderson was subsequently diagnosed with Brugada Syndrome, a serious and lifelong condition that disrupts the heart's normal

2

rhythm. Brugada Syndrome may cause sudden loss of consciousness and death. On June 8, 2016, Anderson underwent surgery to have an automated implantable cardiac defibrillator ("ICD") installed in his heart. An ICD treats the symptoms of Brugada Syndrome by shocking the heart to restore its normal rhythm, but these shocks are powerful enough to knock a sufferer to the ground and cause loss of awareness. Worse, ICDs may misfire, and their functioning can be disrupted by NSRC equipment.

In July 2016, Anderson notified NSRC Health Services ("NSHS") that he had Brugada Syndrome and provided some of his medical records. Anderson also gave NSHS a brief note from his cardiologist, claiming that Anderson was able to return to work without restriction. The letter provided no further detail; it did not even mention the Brugada Syndrome diagnosis.

NSHS's (now former-) Medical Director reviewed Anderson's records and, after considering the essential duties of conductors and engineers, as well as possible accommodations, she determined Anderson could not safely work in either role. On September 22, 2016, an NSHS Medical Services Clinician informed Anderson that he had been found medically unfit to continue as a conductor or engineer. The following day, Anderson received a letter explaining that his disqualification rested on the possibility of "recurrent syncope" related to Brugada Syndrome and the potential that his level of consciousness may be compromised by an ICD shock.

NSRC referred Anderson to its Vocational Rehabilitation Services ("VRS") program, which helps NSRC employees return to work in positions that accommodate their specific restrictions. Anderson met with a VRS manager and identified some

3

positions that could be a good fit for him, but Anderson was only willing to work in a limited geographic area. Over the course of two years, he turned down multiple positions with NSRC because he refused to relocate.

In March 2017, Anderson provided new medical records, which were reviewed by NSHS's present Medical Director. On July 31, 2017, the Director found that the records supported NSHS's initial finding that Anderson was not medically fit to perform the duties of a conductor or engineer. The Director also reviewed a new letter from Anderson's physician, who could not rule out the risk of future syncopal episodes, nor the dangers of ICD shocks. In March 2018, Anderson withdrew from the VRS program and, in the same year, he started an automotive repair business.

On September 21, 2018, Anderson filed a complaint alleging that NSRC violated the Rehabilitation Act of 1973, 29 U.S.C. § 794. On September 18, 2019, Anderson filed an amended complaint, adding claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §951, *et seq.*, 43 Pa. Cons. Stat. § 951 *et seq.*

NSRC moved for summary judgment on all counts, which the District Court granted *in toto*. In a thorough and well-reasoned opinion, the Court explained that Anderson was not "qualified" to work as a locomotive engineer or conductor because he would pose a "direct threat" to himself and others in either role. The Court also found that NSRC made a good faith effort to accommodate Anderson by attempting to place him in another job for which he was qualified.

Anderson timely appealed.

4

II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment de novo. *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). Summary judgment is proper if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "view the facts in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

III.

The ADA "prohibits covered entities from discriminating against qualified employees based on their disabilities." *Eshleman v. Patrick Indus.*, 961 F.3d 242, 245 (3d Cir. 2020).[1] To establish a prima facie case of disability discrimination, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the job, with or without reasonable accommodations; and (3) he was subjected to an adverse employment decision as a result of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). To be "qualified," a plaintiff must be able to "perform the essential functions of the [job]." 42 U.S.C. § 12111(8)

---

[1] On appeal, Anderson makes no distinction between his ADA, Rehabilitation Act, and PHRA claims, each of which is subject to identical substantive standards for liability. *See Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010). Accordingly, we analyze these claims together. Anderson does not appeal the District Court's judgment on his failure to accommodate claim.

5

If a plaintiff would pose a "direct threat" to himself or others by serving in a position, then he is not a qualified individual. *See* 42 U.S.C. § 12111(3) (defining "direct threat" as a "significant risk to [] health or safety" that cannot be eliminated by reasonable accommodation); *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 78–79 (2002) (citing 29 C.F.R. §1630.15(b)(2)); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 764 (5th Cir. 1996) ("An employee who is a direct threat is not a qualified individual with a disability."). An employer's determination that an employee would pose a direct threat must:

> be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> > (1) The duration of the risk;
> > (2) The nature and severity of the potential harm;
> > (3) The likelihood that the potential harm will occur; and
> > (4) The imminence of the potential harm.

29 C.F.R. § 1630.2; *see also Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000) (if an employee threatens grievous harm, then even a small risk thereof may be considered "significant").

Here, the District Court correctly found that NSRC was entitled to assert a direct threat defense and that it defeated Anderson's claim to be qualified. The Court explained that NSHS medical personnel conducted the requisite "individualized assessment . . . based on a reasonable medical judgment that relie[d] on the most current medical knowledge and/or on the best available objective evidence," reviewing Anderson's

6

medical records, his physician's letter, and medical opinions regarding the impact of arrhythmias and ICDs on the operation of commercial vehicles. *See, e.g.*, JA 0090, 0093–103, 0165. Anderson's attempts to suggest otherwise rest on mischaracterizing the record, JA 0010–0012 (NSHS doctor did not "admit[]" to failing to conduct a direct threat analysis), nitpicking, JA 0013 (NSHS doctors did not have to consult a cardiac specialist to conduct adequate individualized assessment), and critiquing irrelevant office practice at NSHS, JA 0013–14 (fact that a letter was sent under name of uninvolved doctor does not impugn analysis). None of Anderson's baseless contentions give rise to a genuine dispute of material fact as to whether the requisite analysis was conducted here.

Moreover, as the District Court concluded, NSRC reasonably considered Anderson a direct threat under § 1630.2's four-factor risk analysis. *See Donahue*, 224 F.3d at 232 (appellant would have posed significant risk working as a train dispatcher, given that he had passed out at work in the past and was at risk of doing so in the future, owing to a heart condition); *E.E.O.C. v. Schneider Nat., Inc.*, 481 F.3d 507, 510 (7th Cir. 2007) (Posner, J.) ("No doubt the risk that a person afflicted with [a syncope-causing disorder] will faint while driving [a truck] is small . . . . But [the employer] is entitled to determine how much risk is too great for it to be willing to take."). Brugada Syndrome is a lifelong disorder of the heart, which can cause syncopal episodes at any time. The ICD implanted to protect Anderson's heart from arrhythmia carries its own risks, as it could discharge unexpectedly and cause Anderson "a complete loss of situational awareness." JA 0015. The duration of the risk is thus indefinite. And the work of a train conductor or engineer—managing freight trains, which may be traveling through densely populated

areas at speed while carrying hazardous materials—entails a severe risk of stunning harm. Were Anderson to suffer a lapse in awareness on the job, the results could be "catastrophic."[2] JA 0016. Although the likelihood that Anderson will experience acute cardiac problems at any given moment may be small, the high stakes involved mean that the District Court was right to regard the risk as significant. *See Donahue*, 224 F.3d at 231. Finally, regarding the imminence of risk, it is true that Anderson has gone long periods without experiencing Brugada-related loss of awareness, but it remains possible this could occur at any moment; thus, the risk is imminent. *See, e.g.*, *Pontinen v. United States Steel Corp.*, 26 F.4th 401 (7th Cir. 2022) (imminence factor favored direct threat finding, even though appellant's seizures were usually "separated by long, uneventful periods").

Accordingly, NSRC established that Anderson would have posed a direct threat to safety in the position of locomotive engineer or conductor. He thus failed to make out a prima facie case, dooming his claims of disability discrimination.

IV.

For these reasons, we will affirm the District Court's judgment.

---

[2] Anderson claims that a device present in locomotives—a so-called "whisker switch"—would reduce the risk of catastrophic harm should he suffer a loss of awareness while driving a train. The District Court was right to reject this argument. If Anderson passed out at the helm, the switch may not even *start* the train's automatic braking process for a full minute. Moreover, "[e]ven if a whisker switch would help reduce some of the risks, it would not address others, such as the conductor's obligation to make repairs while the train is moving, the conductor's responsibility for the train, and the conductor[']s obligation to call signals while on the train." JA 0020.