Michael **KENNELLY**, et al., Plaintiffs,

v.

**PENNSYLVANIA TURNPIKE COMMISSION**, et al., Defendants.

**No. CIV.A. 01–1008.**

United States District Court, E.D. Pennsylvania.

June 16, 2002.

**507**

Gregg L. Zeff, Denise M. Mandi, Frost, Szymanski and Zeff, Philadelphia, PA, for Plaintiffs.

Mark A. Aronchick, Michael Lieberman, Hangley, Aronchick, Segal and Pudlin, Philadelphia, PA, for Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Plaintiffs Michael Kennelly and Cynthia Kennelly, husband and wife ("plaintiffs"), assert claims against defendant Pennsylvania Turnpike Commission, Mitchell Rubin and Joanne Gitto Davis (collectively "the Commission") arising out of Mr. Kennelly's brief employment with the Commission as an Emergency Response Worker. Plaintiffs assert that the Commission violated the American with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA") for terminating Mr. Kennelly in late April 1999, retaliated against Mr. Kennelly for filing a Worker's Compensation claim, and breached a purported employment contract with Mr. Kennelly by terminating his employment.

## I. FACTS[1]

In 1993, Mr Kennelly obtained a job as a part-time toll collector for the Commission. After working less than a week, he resigned. Mr. Kennelly was hired by the Commission again in 1999, as an Emergency Response Worker ("ERW") in the maintenance department. One of the duties of the ERW position was to provide first aid medical assistance to motorists on the Turnpike.[2] At the time of his hiring, Mr. Kennelly was concerned he did not have the medical or emergency responder training to adequately perform in this capacity. In an attempt to remedy this perceived deficiency, one month before reporting to work, Mr. Kennelly completed the American Red Cross Emergency Response course.[3] Mr. Kennelly received 40

1. The facts are either undisputed or when disputed they are construed most favorably to the plaintiffs, the parties opposing the summary judgment. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 332 n. 2, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

2. More specifically, the position of an ERW involved the operation of an emergency response vehicle, responding to emergencies on the Turnpike and rendering emergency medical care, assisting with traffic control, removal of debris from the roadway, highway patrolling, and routine janitorial duties. Knowledge gained through successful completion of American Red Cross Emergency Response and CPR–Professional Rescue training programs is a required prerequisite for an ERW.

3. According to plaintiffs, Mr. Kennelly also completed a CPR course because he lived in a rural setting in the Poconos, his wife was pregnant and her healthcare provider recommended that he take the course.

hours of Emergency Response training in individual sessions from Sgt. Edward Oleyn, an officer with the Philadelphia Police Department.[4] According to plaintiffs, the certification Mr. Kennelly received covered some, although not all, of the skills needed to function as an ERW.

Mr. Kennelly reported for work on Friday, March 12, 1999 as a probationary employee. Mr. Kennelly contends that on the first day of work, he told Michael Haney, District Superintendent of Maintenance, that he lacked hands on experience in responding to medical emergencies. Mr. Haney responded that he should not worry because he would be trained and paired up with an experienced ERW, Donald Beers.

Mr. Kennelly maintains that on Monday, March 15, 1999, he told Mr. Beers and Tom Martucci, a supervisor at the Quakertown location, that he needed additional training, particularly that there was equipment on the emergency response vehicle that he did not know how to use (e.g., oxygen canisters, a suction device and helicopter landing equipment). In response, according to Mr. Kennelly, Mr. Beers told him that he could not train him and Mr. Martucci told him not to worry about it. Mr. Kennelly also contends, and the Commission disputes, that toward the end of that same week he was told by Mr. Beers and Mr. Martucci that the following week he would not be paired with another ERW, that he would be assigned as an ERW on his own.[5] During the week, Mr. Kennelly and Mr. Beers patrolled a fifty-mile stretch of the Turnpike responding to mi-

nor collisions and performing janitorial work as well as picking up road debris.

According to plaintiffs, and allegedly unbeknownst to the Commission, throughout the week, Mr. Kennelly was concerned about operating medical emergency equipment without the proper and necessary medical training. He contends that during that week he spoke with Paul Morrison, the union steward, concerning the additional training that he was to receive on the job and Mr. Morrison told plaintiff that he thought he was being hired as an equipment operator (not an ERW) and that there was an equipment operator opening in the same location. Mr. Kennelly was told by Mr. Morrison that if he wanted to be hired as an equipment operator he would have to speak to the Commission management about the position because it was an appointed position. At the end of the week, according to Mr. Kennelly, he was told by both Mr. Beers and Mr. Martucci to report back to work on the following Monday and that he would be patrolling the highway as an ERW by himself.

By the end of his first week and through the weekend, Mr. Kennelly became increasingly anxious about his ability to do the job of ERW by himself. He claims that his anxieties were heightened by the insensitivity shown by the Commission management to his inquiries regarding training. It is undisputed that these symptoms began during his first week on the job. Mr. Kennelly testified that he started shaking and having flu-like symptoms during the week when he was traveling with Mr. Beers to an accident scene. Mrs. Kennelly testified that during the

---

4. Sgt. Oleyn testified that the purpose of the course, as set forth in the Instructor's Manual, is: "to provide the participant with the knowledge and skills necessary to work as first responder in an emergency to help sustain life, reduce pain, and minimize the consequences of injury or sudden illness until more advanced medical help arrives."

5. Commission employees have testified that Mr. Kennelly would have been paired with another ERW for weeks going forward on various shifts in order to complete his orientation before he would have been out on his own.

week, something was clearly wrong with her husband; he would not eat, he hardly slept, he paced around the house and hid under the covers, and he started shaking and nervously looking at the clock when it came time to go to work.

By the weekend, Mr. Kennelly's symptoms worsened and, on Sunday, March 21, 1999, only nine days after he first reported to work as an ERW, his family brought him to the Geisinger Emergency Room. The emergency room physician noted that Kennelly "fe[lt] panicked, very anxious, mind racing, worried about going back to work tomorrow (first responder on Pa Turnpike)—Does not feel qualified for this job—suicidal thoughts—hallucinations. No previous similar illness." The emergency room physician prescribed medication for Mr. Kennelly and wrote a note excusing him from work for a week. The following day, Mrs. Kennelly delivered the note to Mr. Haney and asked him if Mr. Kennelly could be transferred to the equipment operator position. On March 23, 1999, two days after going to the emergency room, Mr. Kennelly met with Dr. Houshang Hamadani, a psychiatrist. After examining Mr. Kennelly, Dr. Hamadani diagnosed Mr. Kennelly as suffering from panic disorder. Two days after the examination, on March 25, 1999, Dr. Ha-

madani sent a note to the Commission excusing Mr. Kennelly from work until April 4, 1999. On March 29, 1999, he requested that Mr. Kennelly be placed in a "less stressful" position where he would not have to respond to accidents and emergency calls. Dr. Hamadani continued treating Mr. Kennelly through the end of 1999.

The Commission contends that at no time prior to Mr. Kennelly's discharge on April 30, 1999 was he able to return to work. At his deposition, Mr. Kennelly testified that he could not recall whether in March or April of 1999 he might have been able to return to work in a less stressful position, such as equipment operator. Furthermore, although Dr. Hamadani wrote letters to the Commission stating that Mr. Kennelly should not return to work unless his job is changed to a less stressful position, Dr. Hamadani testified that these requests were written as a form of "therapy ... to give the patient hope" that he would be able to return to work in the future and not because he believed that Mr. Kennelly was able to return to work in any position. The Commission relies on this testimony as conclusive proof that Mr. Kennelly was unable to return to work at any point during March or April of 1999.[6]

---

6. With respect to Mr. Kennelly's ability to work, Dr. Hamadani testified as follows:

> Q: ... You said Mr. Kennelly couldn't work.
> A: No.
> Q: Is that because of his symptoms?
> A: Yeah.
> Q: And is that true for the whole time you saw him?
> A: Yeah. Because he was shaking, he was so afraid to drive a car or do anything at that point.
> Q: He couldn't do that you're saying?
> A: Well, at that point he couldn't.
> Q: Well, when you say "at that point," at what point do you mean?

> A: Well, when I saw him first time, for sure he couldn't. And during the time basically his condition remained the same.

Hamadani Dep., 10/15/01, at 14–15 (Def.'s Ex. M). Furthermore, on April 13, 1999, Dr. Hamadani wrote the following in plaintiff's file: "Currently, he is disabled and cannot be involved or engaged in any meaningful activities." Hamadani Treatment Notes at 000163 (Def.'s Ex. K).

With respect to the letters he wrote in which he stated that Mr. Kennelly should be reassigned to a less stressful position, Dr. Hamadani explained that he wrote those letters at Mr. Kennelly's request in order to give him hope, but that Mr. Kennelly was not ready or able to return to work. Furthermore, Dr. Hamadani testified in response to a

The day following Mr. Kennelly's visit to the emergency room, Mrs. Kennelly informed the Commission that Mr. Kennelly would not be coming to work that week. On or about March 29, 1999, Mr. Haney received a copy of Dr. Hamadani's letter of that date in which the doctor excused Mr. Kennelly from work until April 4, 1999 and stated that Mr. Kennelly felt panic when he was responding to emergency calls and recommended that his job be changed to a position that did not involve responding to accidents and emergencies. On March 31, 1999, after reviewing the emergency room records and Dr. Hamadani's letters, Mr. Haney concluded that Mr. Kennelly could not perform the ERW job and that because of safety concerns for Kennelly and the Commission's customers, he recommended that Mr. Kennelly be discharged from employment. Based on Mr. Haney's evaluation, Robert Wallett, Director of the Maintenance Department, concluded that Mr. Kennelly could not work as an ERW or as an equipment operator, as that position also involved emergency situations, and suggested that perhaps Mr. Kennelly could be a toll collector.

Due to Dr. Hamadani's and Mrs. Kennelly's requests for accommodations for Mr. Kennelly (i.e. transfer to the equipment operator or other "less stressful" position), the Commission's ADA Coordinator, Deborah Carpenter, was consulted. Subsequently, on April 9, 1999, a meeting concerning Mr. Kennelly was held between Ms. Carpenter, Mr. Wallett, and Joanne Gitto Davis, the Commission's Director of Human Resources, among others. Although there were different opinions at that meeting regarding how to proceed, it was subsequently determined that the Commission could not transfer Mr. Kennelly to toll collection for two reasons: 1) toll collectors and maintenance workers were in separate bargaining units, and the collective bargaining agreement in force at the time did not permit transfers between bargaining units; and 2) the Commission was not in any event obligated to consider reassignment of Mr. Kennelly to another position because he was a probationary employee and was not able to perform the essential functions of the ERW job.

Plaintiffs argue that there is an issue of fact as to what steps the Commission took or should have taken prior to its determination that Mr. Kennelly should be terminated. Ms. Davis testified that at the meeting she was of the opinion that they should notify the physician and get more information as to whether or not plaintiff was disabled as defined by the ADA and what, if any, accommodation the physician felt would be required in order for Mr. Kennelly to perform his duties.[7] Furthermore, Ms. Davis stated that although no resolution regarding Mr. Kennelly was reached at the conclusion of the meeting, it was decided that maintenance was to be contacted to get additional information regarding other possible vacancies that were not to be filled through the seniority pro-

---

question by Mr. Kennelly's counsel, that he would have taken action to prevent Mr. Kennelly from taking a job operating a truck:

Q: If he had been offered a job driving a truck, in March or April of 1999, would you have done anything to stop him from doing that?

A: That's a—you know, if, if he was shaking like this? Yes, I would have—it would be safe to drive. But if he was not having symptoms, I would let him. . . .

Hamadani Dep., at 47–48.

7. However, the Commission contends that because at that meeting it was decided that there was no requirement that Mr. Kennelly be transferred, the ADA consultant, Ms. Carpenter decided that there was no need to request further information from Dr. Hamadani. She therefore did not send out the letter she drafted to Dr. Hamadani for this purpose.

cess and additional research was to be done in case law and EEOC guidelines.

On April 19, 1999, Mrs. Kennelly called Commissioner Rubin and spoke to his secretary concerning transfer to the position of an equipment operator. The Commissioner's secretary suggested that Mrs. Kennelly contact Pat Raskauskas, the Head of the Commission's Worker's Compensation Department, to inquire whether Mr. Kennelly was eligible for worker's compensation. According to Mrs. Kennelly, she then spoke with Ms. Raskauskas who informed her that Mr. Kennelly was entitled to worker's compensation. Mrs. Kennelly contends that several hours later, she received a phone call from Joanne Gitto Davis, Director of Human Resources, informing Mrs. Kennelly that not only was Mr. Kennelly not employed long enough to receive worker's compensation benefits, Mr. Kennelly could not prove that his injury was job related since he had a psychiatric condition and could not perform the duties of his job. According to Mrs. Kennelly, Ms. Davis further stated that if Mr. Kennelly tried to obtain worker's compensation benefits, he would be terminated from the Commission. Mrs. Kennelly then wrote to Ms. Raskauskas sending her copies of Mr. Kennelly's medical records and voicing her concern over Ms. Davis' alleged threat. On or around April 24, 1999, Mr. Kennelly filed a worker's compensation claim.

Ultimately, on April 30, 1999, Robert Wallett, Director of the Maintenance Department, sent the paperwork recommending Mr. Kennelly's dismissal to Ms. Davis. Ms. Davis and the Commission's executive director accepted the recommendation and on that day, Ms. Davis sent a termination letter to Mr. Kennelly, stating that "the reasons for this termination is your failure and inability to perform the duties of an Emergency Response Worker during your probationary period as well as your continued unavailability for work."

## II. THE COMMISSION'S MOTION FOR SUMMARY JUDGMENT

### A. Plaintiffs' ADA and PHRA Claims.

The Commission argues that it is entitled to summary judgment on Mr. Kennelly's ADA and PHRA claims because Mr. Kennelly was not qualified to perform the essential functions of the job he was hired for, the Commission was not obligated to make any accommodations for him and, in any event, there were no accommodations that could have been made.

 a. *Was Mr. Kennelly otherwise qualified to perform the essential functions of the job with or without reasonable accommodation?*

■■■ In order to prevail on a claim of discrimination under the ADA or PHRA, a plaintiff must show, among other things, that "he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir.1999).[8] Although Mr. Kennelly met the objective criteria for the job, he was not qualified to perform the essential functions of the job of an ERW because, as his doctor explained, Mr. Kennelly could not work in "emergency situations," he could not respond to accidents or take care of people with injuries.

■ The Commission asserts that the only requests made on behalf of Mr. Ken-

---

8. Plaintiff must also show that he is a disabled person within the meaning of the ADA and has suffered an otherwise adverse employment decision as a result of discrimination. *Id.* For the purpose of this motion, the Commission concedes that Mr. Kennelly can satisfy these elements.

nelly for a reasonable accommodation were the requests by Mrs. Kennelly that Mr. Kennelly be transferred to an equipment operator position and by Dr. Hamadani that Mr. Kennelly be transferred to a "less stressful" position.[9] However, according to the Commission, reassignment was not an option for two reasons. First, the Commission was not obligated to consider reassignment of Mr. Kennelly. While ordinarily an employer must consider reassignment as an option to accommodate an employee with a disability covered by the ADA, 42 U.S.C. § 12111(9), E.E.O.C. Enforcement Guidance explains that if a:

> probationary employee has *never* adequately performed the essential functions, with or without reasonable accommodation, then s/he is not entitled to reassignment because s/he was never "qualified" for the original position.

E.E.O.C. Enforcement Guidance: *Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* § 25 (emphasis in original).[10] *See also Motley v. New Jersey State Police*, 196 F.3d 160, 166 (3d Cir.1999) (quoting *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)) (" 'Employers . . . are not required to find another job for an employee who is not qualified for the job he or she was doing.' "). Mr. Kennelly was a probationary employee because he had been on the job for less than 90 days and, according to the Commission, he never adequately performed the essential functions of the job. Although Mr. Ken-

nelly possessed the appropriate skills and certifications, i.e. emergency responder and CPR certifications, he was not able to function as an ERW due to a psychological condition, characteristic or trait that made it impossible to do this type of work. Therefore, the Commission was not obligated to reassign him.

▬ The Commission argues that the second reason why reassignment was not any option was because Mr. Kennelly could not perform the essential functions of any job. An ADA plaintiff has the burden to identify a reasonable accommodation that would enable him to perform the essential functions of the job. *See Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir.2001). If the proposed accommodation (here, reassignment) is "clearly ineffective," and the plaintiff cannot perform the essential functions of the job with that accommodation, summary judgment is appropriate. *Skerski*, 257 F.3d at 284 (quoting *Walton v. Mental Health Assoc. of Southeastern Pa.*, 168 F.3d 661, 670 (3d Cir.1999)). The Commission maintains that Dr. Hamadani's notes and testimony clearly establish that Mr. Kennelly could not have returned to work in any position after his breakdown and, thus, there is no material dispute of fact with respect to this issue. *See Williams v. Toyota Motor Manufacturing, Kentucky, Inc.*, 224 F.3d 840, 844 (6th Cir.2000) (plaintiff who is restricted completely from working cannot claim to be a qualified individual with a disability within the meaning of the ADA). Since Mr. Kennelly could not perform the

---

9. As stated below, plaintiffs dispute this contention and argue that Mr. Kennelly also sought the reasonable accommodation of additional training.

10. Although the court is not bound to the statement of law set forth in an E.E.O.C. Guidance, substantial deference is due. In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986),

the Supreme Court relied upon an E.E.O.C. Guidance and stated: "As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* (internal quotations omitted).

essential functions of any job—including the job he had and the job he desired, with or without reasonable accommodations—he was not an otherwise qualified individual under the ADA.[11]

Plaintiffs admit that Mr. Kennelly can no longer perform the ERW position; but rather submits that he cannot because of the manner in which defendant treated Mr. Kennelly with regard to training. While it is true that Mr. Kennelly is currently unable to perform work in any capacity with or without reasonable accommodation, Mr. Kennelly suffered his debilitating emotional breakdown when he allegedly was told by his employer that he was going to be assigned to ERW work on his own without any further training. Thus, plaintiffs argue, Mr. Kennelly was initially qualified[12] but became unqualified due to defendant's actions. Thus, there is a genuine issue of

material fact as to whether Mr. Kennelly was ever qualified to perform the duties of the ERW position and, thus, whether he is a qualified individual under the ADA.

 Furthermore, there is a genuine issue of material fact as to whether Mr. Kennelly could have performed the essential functions of the job with reasonable accommodation and whether the Commission properly participated in the interactive process to determine whether a reasonable accommodation was feasible. According to the ADA, a "reasonable accommodation" includes:

Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modifications of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers

11. The Commission further argues that Mr. Kennelly is estopped from denying that he was totally disabled and incapable of performing any job because in May of 1999, Mr. Kennelly applied for, and subsequently obtained, Social Security disability benefits and, in connection with his application for those benefits, Mr. Kennelly represented that his total disability began in March of 1999. In so arguing, the Commission relies on *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 797, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). There, the Supreme Court held that:
... pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention *is consistent with* her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."
*Id.* at 797–98, 119 S.Ct. 1597 (emphasis added).

The Commission misapplies the holding of *Cleveland.* There, the Supreme Court acknowledged that despite the appearance of a conflict in the language of the two statutes, there are many situations "in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 803, 119 S.Ct. 1597. For example, the ADA defines a qualified individual as one "who ... can perform the essential functions" of a job "with reasonable accommodations"; while the SSA determination of disability does not take the possibility of reasonable accommodation into account. *See id.* Thus, the SSA finding that Mr. Kennelly is disabled as of March 1999 is consistent with his ADA claim.

12. Mr. Kennelly possessed the requisite training and had adequately performed his duties prior to his breakdown. Defendants own expert stated that: "Mr. Kennelly was well trained to assume the duties of an Emergency Response Worker for the Commission. The courses Mr. Kennelly took are well established, time tested programs which have traditionally been given to First or Emergency Responders over the years in a wide variety of settings."

or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).[13] While plaintiffs bear the burden of "identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits," summary judgment is only appropriate where plaintiffs' "proposal is either clearly ineffective or outlandishly costly." *Skerski v. Time Warner Cable Company*, 257 F.3d 273, 284 (3d Cir.2001).

Plaintiffs claim that Mr. Kennelly sought an accommodation by asking for further training and this request was refused. The Commission responds that Mr. Kennelly's request for additional training during his week on the job was not a request for reasonable accommodation because neither Mr. Kennelly nor the Commission at that time identified the request as one related to a disability on Mr. Kennelly's part. *See Taylor*, 184 F.3d at 313 (a request for accommodation "must make clear that the employee wants assistance for his or her disability"). Rather, Mr. Kennelly simply was telling his employer that he did not feel adequately trained for or qualified to perform the job he had obtained; by the time Mr. Kennelly and the Commission recognized that he had a psychiatric condition, Mr. Kennelly made no requests for further training and did not suggest that any modifications or adjustments could have been made, or training provided, to allow him to continue in the position of ERW.

However, because Mr. Kennelly's repeated requests for additional training occurred just a few days before his emotional breakdown, a genuine issue of material fact exists as to whether the request for training was a request for a reasonable accommodation. On the Monday after Mr. Kennelly's week of active employment, Mrs. Kennelly called the Commission and informed them of Mr. Kennelly's breakdown and asked for a change of positions. Given the temporal proximity of Mr. Kennelly's requests for additional training and the fact that his perceived lack of training caused his breakdown, there is an factual issue as to whether his request for training constituted a request for a reasonable accommodation. *See id.* ("What matters under the ADA [is] whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for accommodation.").

This issue is particularly relevant in light of the Commission's duty "to initiate an informal, interactive process with the [employee] in need of accommodation" once the employer has knowledge of the disability and the employee's desire for accommodation. 29 C.F.R. § 1630.2(*o*)(3); *Taylor*, 184 F.3d at 311.[14] The Third Cir-

---

13. The relevant regulations define reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii).

14. The EEOC Interpretative Guidance states that after a disabled employee requests reasonable accommodation the employer should: (1) analyze the particular job involved and determine its purpose and essential func-

tions; (2) consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation; (3) in consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and (4) consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

cuit recently noted that "an employer that fails to engage in the 'interactive process' runs a substantial risk: 'if an employer fails to engage in the interactive process, it may not discover a way in which the employee's disability could have been accommodated, thereby risking violation of the Rehabilitation Act.'" *Shapiro v. Township of Lakewood*, 292 F.3d 356, 359 (3d Cir. 2002) (quoting *Mengine v. Runyon*, 114 F.3d 415, 420–21 (3d Cir.1997)).

■ It is not fatal to an ADA claim that the employee fails to request a specific accommodation or that the employee's request was for an accommodation which is admittedly not possible. *Taylor*, 184 F.3d at 315. "The interactive process, as its name implies, requires the employer to take some initiative." *Id.* The regulations provide that the interactive process "should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Thus, the Third Circuit has held that it "would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process" particularly because the employer often holds more information about what other positions are available or what adjustments are feasible in the employee's current position. *Taylor*, 184 F.3d at 316. Employers can show that they have met their duty to make a "good faith effort to seek accommodations" by taking steps including the following: "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome." *Id.*

29 C.F.R. pt. 1630 app. 1630.9 (1997).

at 317. An employer cannot prevail at the summary judgment stage if a genuine issue of fact exists as to whether the employer in good faith engaged in the interactive process. *Id.* at 318–19.

■ Here, once Mrs. Kennelly and Dr. Hamadani requested accommodations on Mr. Kennelly's behalf, i.e. to transfer to the position of equipment operator or to a less stressful position, the interactive process was initiated. In failure-to-transfer cases, "the plaintiff bears the burden of demonstrating: (1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation." *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 230 (3d Cir.2000). However, an employee need not show that he or she formally applied for the position in question. *See Shapiro*, 292 F.3d at 359–60.

There is no dispute that the first two prongs of the *Donahue* test are met in this case with respect to plaintiff's request for the equipment operator position. Furthermore, the court finds that there is a genuine issue of material fact as to whether plaintiff was qualified to perform the essential duties of the equipment operator position because it is not clear that responding to emergency situations is an essential function of the equipment operator position. *Cf. Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 232 (3d Cir.2000) (transfer to position of train dispatcher, where plaintiff was clearly unable to monitor trains, the essential function of the job, was not a feasible reasonable accommodation).

Once Mr. Kennelly made his requests for a reasonable accommodation, the Commission did not do any additional research

or inquire into Mr. Kennelly's condition or participate in any discussions with Mr. Kennelly as to how he might be accommodated. Under the Commission's own ADA procedures, Deborah Carpenter, the Commission's ADA consultant, was supposed to send to Dr. Hamadani an accommodation request form, medical information release and an ADA information request form to assist the Commission in assessing Mr. Kennelly's disability and determining whether an accommodation was feasible. However, Carpenter never sent those forms to Dr. Hamadani because the Commission had already made a determination that Mr. Kennelly was not qualified. Nor did the Commission look into any other feasible positions for Mr. Kennelly or attempt to contact Mr. or Mrs. Kennelly to discuss the possibilities of an accommodation. In light of Mr. Kennelly's earlier requests for additional training, communication with Mr. Kennelly, or even Ms. Kennelly, was an important part of the interactive process.

The court finds that there is a genuine issue of material fact as to whether the Commission made a reasonable effort to determine the appropriate reasonable accommodation. Thus, the Commission's motion for summary judgment on plaintiffs' ADA and PHRA claims will be denied.

b. *Were the reasons offered by the Commission for terminating Mr. Kennelly pretextual?*

■ The Commission further argues that it is entitled to summary judgment on Mr. Kennelly's ADA and PHRA claims because plaintiffs cannot show that the legitimate reasons offered by the Commission for terminating Mr. Kennelly were pretextual. To survive summary judgment, upon a showing by the defendant of a legitimate reason for termination, the plaintiff must:

... point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). To satisfy this burden, the plaintiff must "point to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765. The Commission maintains that it terminated Mr. Kennelly because he was unqualified for the job he was hired to do and because he failed to appear at work for almost six weeks. The reasons for Mr. Kennelly's dismissal were straightforward and legitimate and plaintiffs have pointed to no evidence which could lead a factfinder to question them or suggests the existence of discriminatory intent.

However, due to the factual dispute regarding the Commission's good faith participation (or lack thereof) in the interactive process and the Commission's assertion that the decision to terminate Mr. Kennelly was made on March 30, 1999 nearly two weeks before the interdepartmental meeting to discuss Mr. Kennelly's status, a reasonable jury could find that an invidious discriminatory reason was more likely than not a motivating factor in its decision to terminate Mr. Kennelly. *Id.*

B. *Retaliation Claim.*

■ Plaintiffs also alleged that the Commission fired Mr. Kennelly in retaliation for filing a claim for worker's compensation benefits. The essence of the retaliation claim is that on April 19, 1999,

Mrs. Kennelly spoke with Pat Raskauskas, the Head of the Commission's Worker's Compensation Department, about the possibility of her husband receiving worker's compensation benefits. After that conversation, Mrs. Kennelly allegedly received the call from Ms. Davis, the Director of Human Resources, in which Davis allegedly stated that Mr. Kennelly was not entitled to worker's compensation and that if he applied for such benefits, he would be terminated. On April 19, 1999, Mrs. Kennelly wrote a letter to Ms. Raskauskas which reports the conversation with Davis.[15] In a letter dated April 24, 1999, Mr. Kennelly's lawyer wrote to the Commission to notify the Commission that Mr. Kennelly was making a claim for worker's compensation benefits. On April 30, 1999, Mr. Kennelly was terminated.

 Generally, under Pennsylvania law, "no cause of action exists based upon an employer's termination of an at-will employee." *Shick v. Shirey,* 552 Pa. 590, 716 A.2d 1231, 1233 (1998). However, an exception to this rule exists when an at-will employee is terminated for exercising his rights under the Worker's Compensation Act. *See id.,* 716 A.2d at 1237. In assessing a retaliatory discharge claim, federal courts look to the analysis applied in Title VII retaliation cases. *See Landmesser v. United Air Lines, Inc.,* 102 F.Supp.2d 273, 277 (E.D.Pa.2000). In order to recover on a retaliatory discharge claim, plaintiff must show, "(1) he engaged in a protected activity; (2) he was discharged after or contemporaneous with the activity; and (3) a causal link existed between the protected activity and threats to sue, and the loss of his job." *Quiroga v. Hasbro,* 934 F.2d 497, 501 (3d Cir.1991). If an employee establishes a *prima facie* case of retaliation under the ADA, the burden shifts to the

employer to advance a legitimate, non-retaliatory reason for its adverse employment action. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 501 (3d Cir. 1997). If the defendant meets this burden of production, the burden shifts back to plaintiff to establish that the defendant's "proffered explanation was false and that retaliation was the real reason for the adverse employment action." *Id.* Specifically, the plaintiff must "prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Id.*

It is clear from the evidence that Mr. Kennelly engaged in a protected activity, applied for worker's compensation benefits on April 24, 1999, and that he was discharged after or contemporaneously with the activity, April 30, 1999. However, the Commission argues that Mr. Kennelly's retaliation claim fails because he cannot show a causal link between the protected activity and the discharge in that the individual who made the decision to fire Mr. Kennelly, Robert Wallett, Director of the Maintenance Department, had no knowledge of Mr. Kennelly's worker's compensation claim. On or about March 30, 1999, after receiving a suitability evaluation of Mr. Kennelly, Mr. Wallett concluded that Mr. Kennelly was not qualified to be an ERW and preliminarily determined that he should be terminated. Rather, it was not until after the April 9, 1999 meeting in which it was determined that the Commission could not offer Mr. Kennelly another position was Mr. Wallett's decision to terminate implemented. The Commission maintains that Mr. Wallett had no knowledge during this process and through April 30, 1999, when Mr. Kennelly was formally

---

**15.** Ms. Davis denies every speaking with Mrs. Kennelly at any time. Whether or not she did

is, of course, a jury issue.

discharged, that Mr. Kennelly had filed a claim for worker's compensation benefits. The claim from Mr. Kennelly's lawyer was written on April 24, 1999 and there is no record of when it was received by the Commission.

However, the court finds that given the close temporal proximity of the protected activity and Mr. Kennelly's discharge, *see Jalil v. Avdel,* 873 F.2d 701, 708 (3d Cir. 1989), and the fact that Ms. Davis and Mr. Wallett had previously discussed the issues concerning Mr. Kennelly's employment and possible discharge,[16] there is a genuine issue of material fact, albeit thin, as to whether there is a causal link between Mr. Kennelly's request for worker's compensation benefits and his eventual discharge.

At this point, the Commission has met its burden to advance a legitimate, non-discriminatory reason for discharging Mr. Kennelly, i.e. his lack of qualifications and his absence from work. However, the court finds that there is sufficient evidence, again albeit slim, to call into question the Commission's true motivation for discharging Mr. Kennelly. Namely, the Commission maintains that it made a decision to terminate Mr. Kennelly on March 31, 1999. However, despite the April 9, 1999, ADA meeting, the official termination did not occur until April 30, 1999, just days after the request for worker's compensation benefits was sent to the Commission. It is up to the jury

and not the court to decide the factual issue of whether the decision to terminate was made on March 31, 1999 as the Commission contends or the after the April 19, 1999 telephone call and April 24, 1999 letter to the Commission reporting Mr. Kennelly's intention to file for worker's compensation benefits. Thus, the Commissions motion for summary judgment on plaintiff's retaliation claim will be denied.

### C. *Breach of Contract Claim.*

The Commission argues that Mr. Kennelly's breach of contract claim fails because Mr. Kennelly was an at-will employee and no contract existed between him and the Commission altering the nature of this relationship. The complaint alleges the existence of a "contract of employment consisting of both written and oral components," Compl. ¶ 44. The Commission disputes this assertion. Either party in an employment relationship can terminate that relationship at will unless there is a contractual or statutory provision to the contrary or if such termination would violate public policy. *See Shick,* 716 A.2d at 1233. To rebut the at-will presumption, the plaintiff must establish an agreement for a definite duration, an agreement specifying that the employee will be discharged for just cause only, sufficient additional consideration or an appli-

---

**16.** Relying on *Mroczek v. Bethlehem Steel Corp.,* 126 F.Supp.2d 379, 390 (E.D.Pa.2001), the Commission argues that in order to establish a *prima facie* case of retaliation, the plaintiff must demonstrate that the protected activity was known to the person responsible for the termination. In *Mroczek,* the court granted summary judgment in part because plaintiff failed to produce evidence that the discharge decision-maker had any knowledge of her protected activity which took place over a year before plaintiff was discharged. *Id.* at 390. However, the court finds that the facts are *Mroczek* are distinguishable from the

instant case where only six days elapsed between protected activity and discharge and the individual aware of the protected activity and the individual responsible for Mr. Kennelly's discharge had conferred on the subject of Mr. Kennelly's employment status just a few weeks prior to his discharge. *See cf., Anderson v. Deluxe Homes of Pennsylvania, Inc.,* 131 F.Supp.2d 637, 656 (E.D.Pa.2001) (causal link demonstrated, in part, because decision-maker works closely with individual to whom plaintiff made complaint of harassment).

cable recognized public policy exception. *See Rapagnani v. Judas Company,* 736 A.2d 666, 669 (Pa.Super.1999).

 Plaintiffs rely on the collective bargaining agreement, between the union and the Commission, and the Commission's employee handbook as evidence of the existence of an employment contract between Mr. Kennelly and the Commission. Assuming without deciding that Mr. Kennelly was a member of the bargaining unit covered by the collective bargaining agreement, he must seek a remedy through the grievance procedure set forth in the collective bargaining agreement in the first instance, not through a separate claim for breach of contract. *See* Collective Bargaining Agreement, 75–81 (Plaintiffs' Ex. V). Thus, to maintain a claim for breach of contract under state law, Mr. Kennelly must first exhaust his remedies under the collective bargaining agreement.

 Neither does the Commission's employee handbook provide a basis for plaintiffs' breach of contract claim. An employee handbook does not create a contract absent a clear indication of such intent by the employer. *See Brethwaite v. Cincinatti Milacron Marketing Co.,* No. Civ.A. 94–3621, 1995 WL 232519, at *5 (E.D.Pa. April 19, 1995) ("in order for a handbook to be construed as a contract it must contain unequivocal provisions that the employer intended to be bound by it, and, in fact renunciated the principle of at-will employment") (quoting *Mudd v. Hoffman Homes for Youth, Inc.,* 374 Pa.Super. 522, 543 A.2d 1092, 1096 (1988)). The Commission's handbook, on the other hand, specifically provides that: "This handbook is designed to be used as an informational guide to certain employment

policies of the Pennsylvania Turnpike Authority. It is not an employment contract and is not intended to set forth any terms or conditions of employment nor to supersede any contract of employment." Def.'s Reply Br., Ex. 1. Thus, it is clear that the Commission's employee handbook did not create a contract of employment between Mr. Kennelly and the Commission. Because plaintiffs have presented no evidence pointing to a contract of employment between Mr. Kennelly and the Commission, the Commission is entitled to judgment as a matter of law on plaintiffs' breach of contract claim.[17]

## III. CONCLUSION

For the foregoing reasons, the Commissions' Motion for Summary Judgment will be granted in part and denied in part. It will be granted to the extent that Mr. Kennelly's claim for breach of contract under state law as well Mrs. Kennelly's claim for loss of consortium, to the extent it derives from the breach of contract claim, will be dismissed. It is denied to the extent that Mr. Kennelly's ADA, PHRA and retaliation claims as well as the remainder of Mrs. Kennelly's loss of consortium claim will not be dismissed.

---

**17.** The Commission's motion for summary judgment on Mrs. Kennelly claim for loss of consortium will be granted in part and denied in part. Because Mrs. Kennelly's claim is derivative of Mr. Kennelly's claims, the loss of consortium claim will stand as to Mr. Kennelly's claims under the ADA and PHRA and for retaliation and will be dismissed as to Mr. Kennelly's claim for breach of contract.