**Howard C. KIBURZ, Appellant**

v.

**Gordon R. ENGLAND, Secretary, United States Department of the Navy.**

**No. 09–2184.**

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit L.A.R. 34.1(a) Jan. 15, 2010.

Filed: Jan. 19, 2010.

---

Ralph B. Pinskey, Esq., Pinskey & Foster, Harrisburg, PA, for Appellant.

Kate L. Mershimer, Esq., Office of United States Attorney, Harrisburg, PA, for Gordon R. England, Secretary, United States Department of the Navy.

Before: SCIRICA, Chief Judge, BARRY, and SMITH, Circuit Judges.

## OPINION

SMITH, Circuit Judge.

In this appeal, Howard C. Kiburz argues that the District Court improperly granted summary judgment to the United States Department of the Navy (the "Navy") on his claims brought under the Rehabilitation Act, 29 U.S.C. § 701 et seq., alleging (1) discrimination based on his medical disability and (2) constructive discharge.[1] After a careful review of the record, we conclude that the District Court properly granted summary judgment for the Navy on both claims and will affirm the District Court's judgment.

## I.

### Kiburz's Employment

Kiburz was employed by the Navy as a GS–12 Information Technology ("IT") Specialist in Mechanicsburg, Pennsylvania. An IT Specialist, as explained in Kiburz's job description, "performs a wide variety of complex [IT] duties," including:

- "Provid[ing] technical advice/assistance to customers[ ], user representatives, subject-matter experts and IT personnel regarding a wide variety of IT matters related to special projects, [and] unique maintenance problems[.]"

1. The District Court exercised jurisdiction over this case under 28 U.S.C. § 1331, and we review its grant of summary judgment under 28 U.S.C. § 1291. We exercise "plenary review over the District Court's grant of summary judgment." Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir.2005) (internal quotation omitted). A court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying that standard, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Shuman, 422 F.3d at 146 (internal quotation omitted).

- Participating in "extensive coordination/consultation with personnel responsible for related systems/applications/operations, significant data gathering and other fact finding efforts[.]"
- Providing "lower level software engineers, [if any,] with guidance and assistance regarding overall project/assignment issues and complicated technical matters such as those not covered by guidance or precedence; assign[ing], integrat[ing], coordinat[ing] and monitor[ing] their work; provid[ing] information to the supervisor concerning their performance and potential morale or other problems."

In practice, according to one of Kiburz's supervisors,[2] Ed Ferguson, Kiburz's job required "working with others, *e.g.*, Project Officers, Business System Designers, etc., and attending meetings—sometimes numerous meetings and, with some regularity, unplanned meetings—with various persons such as users, team members, other IT staff, and supervisors—to plan and carry out the IT work, resolve problems, allocate resources, and deal with many issues arising in the field of IT." According to the job description, an IT Specialist's "[c]ompleted work is reviewed from an overall standpoint in terms of technical adequacy, feasibility, compatibility with other work/systems, effectiveness in meeting requirements and achieving desired results, [and] timeliness[.]" An IT Specialist is also reviewed based on her ability to establish "effective working relationships with customers[ ], assistants, and other co-workers."

*Kiburz's Medical Condition and Requests for Accommodation*

Kiburz has arthritis in his spine, a debilitating medical condition that causes unpredictable, episodic back pain, requiring immobilization and bed rest. Although the record is unclear, it appears that Kiburz was diagnosed with the condition over ten years ago, around December 14, 1998. Since his diagnosis, Kiburz has sought several accommodations for his medical condition from the Navy. Among them, Kiburz requested (1) a flexible work schedule, (2) permission to work from home, and (3) a special chair for working in the office.

*Kiburz's Requests for a Flexible Work Schedule*

In September 1999, Kiburz sought a flexible work schedule under the Navy's Flexi–Schedule Program. He requested a schedule that would permit him to arrive between 6:30 a.m. and noon, and depart between 3:30 p.m. and 8:30 p.m., during the work-week. He also requested the option of working on weekends. The Navy approved his request for a flexible work schedule for one year, but limited his arrival and departure times to between 6:30 a.m. and 11:00 a.m. and between 3:30 p.m. and 7:30 p.m., respectively. The Navy rejected his request to work on weekends.

In September 2000, at the expiration of the one year term, Kiburz sought renewal of his flexible work schedule. His request was denied by his then-supervisor, Donald Humphrey. After discussing the issue with Starr Lehman, an employee at the Workforce Diversity Office, Humphrey decided to wait until Kiburz's tasking for a

---

**2.** Kiburz had three supervisors over the course of the events leading to this appeal: Ed Ferguson, Donald Humphrey, and Larry Greenawalt. Ferguson was Kiburz's supervisor until April 2000. At that time, Humphrey was named Kiburz's supervisor. In February 2001, Kiburz was assigned back to Ferguson. He stayed with Ferguson until November 2002, when he was assigned to Greenawalt.

project had been identified before seriously considering whether to grant Kiburz a flexible work schedule. Humphrey suggested to Kiburz that he resubmit his request after the project's workload was known. Kiburz, however, never resubmitted his request to Humphrey.

In March 2001, Kiburz submitted another flexible work schedule request to his then-supervisor, Ferguson. After discussing Kiburz's request with Lehman, Ferguson proposed a 60–day trial flexible work schedule. Ferguson's proposal permitted Kiburz to keep hours similar to those he kept under his September 1999 flexible work schedule. Kiburz rejected the proposal because it would "only reduce [his] use of [Leave Without Pay (LWOP) ] by a few hours each pay period."

### Kiburz's Requests to Work from Home

In July 2000, Kiburz began requesting to work from home. Dr. Bruce MacKellar, Kiburz's doctor, believed that working from home might mitigate some of Kiburz's back pain and increase his productivity. Dr. MacKellar told the Navy that Kiburz's condition was likely to worsen and that Kiburz would need almost complete immobility for pain control should he experience an episode of back pain. The frequency and length of these episodes of pain were, according to Dr. MacKellar, unpredictable. Based on this information, the Navy denied Kiburz's request to work from home, reasoning that Kiburz would be unable to work from home even if his request was granted. On January 31, 2001, Kiburz submitted a second request to work from home. That request was denied for the same reason.

### Kiburz's Search for a Special Chair

Kiburz also requested a special chair, one that would mitigate his back pain, for use at the office. On September 19, 2000, that request was approved and the Navy arranged for Wendy Beecher, a Health and Occupation Specialist employed by the Navy, to work with Kiburz to find an appropriate chair. Beecher told Kiburz that she needed his doctor to recommend an appropriate chair that would address his medical condition. Five months later, in February 2001, Kiburz submitted his doctor's recommendation. That recommendation stated that Kiburz should be given a "high-backed, tilting executive type chair with significant padding in both back and seat areas with arm rests on each side[.]" Beecher permitted Kiburz to search for a chair that met those requirements, but Kiburz was unable to find anything to his liking. Beecher also took Kiburz's own description of a suitable chair, which elaborated on his doctor's description, to multiple vendors and had those vendors bring in chairs for Kiburz to try. According to Beecher's declaration, she visited or contacted five vendors and brought in at least five chairs for Kiburz. Kiburz rejected all the chairs.

On March 14, 2002, Beecher had an occupational therapist from an outside medical clinic perform an ergonomic evaluation on Kiburz. After meeting with Kiburz, the occupational therapist told Ferguson that Kiburz wanted a chair that could significantly recline, but that such a chair would actually exacerbate Kiburz's medical condition. As a result, the occupational therapist was unable to find a chair for Kiburz.

### Kiburz's Removal and Appeal to the Merit Systems Protection Board

On October 31, 2001, Ferguson informed Kiburz that his frequent absences were burdening the Navy's other employees and harming the organization. Ferguson also stated that additional frequent absences

may jeopardize Kiburz's position.[3] In February 2002, while the chair search was ongoing, Ferguson recommended to the Navy that Kiburz be terminated. On May 3, 2002, the Navy removed Kiburz due to his unpredictable, unscheduled absences, and his inability to perform his work.[4]

Kiburz appealed his removal to the Merit Systems Protection Board (the "Board"), claiming that his absences were approved and that his removal was discriminatory under the Rehabilitation Act. On September 20, 2002, the Board issued its initial decision stating that Kiburz's removal was procedurally improper because he had not been given a "reasonable" amount of time to modify his behavior after he was warned by Ferguson of his possible removal. The Board ordered that Kiburz be reinstated, but rejected Kiburz's claim that his removal violated the Rehabilitation Act. In doing so, it determined that Kiburz was not a "qualified disabled person" under the statute because he could not perform the essential functions of his job with or without a reasonable accommodation. On September 5, 2004, the Board affirmed its initial decision.

*Kiburz's Return to the Navy*

In November 2002, shortly after the Board issued its initial decision, Kiburz returned to work. On his return, Kiburz requested a new chair because the chair he had been using prior to his removal was breaking. His newly assigned supervisor, Larry Greenawalt, attempted to accommodate Kiburz's request for a new chair by providing him with a Big and Tall catalog of chairs and offering to drive Kiburz to local stores to find a chair on government time. Eventually, Kiburz picked a chair from the Big and Tall catalog and it was acquired for his use in the office.

---

3. Ferguson's October 31, 2001 letter to Kiburz stated:

> I am concerned about [your largely unscheduled absences from work, totaling approximately 700 hours over 8 months]. While fully sympathetic to your condition and what I perceive as your inability to either work a full work schedule or confidently predict in advance when your condition would preclude your coming to work on a particular day, I am responsible for carrying out the mission of the Branch. You are an important member of the organization and the work assigned to you is a key component of the overall work output. When you are unable to work, I must often assign your work to other subordinates to assure timely completion. In addition, I am unable to schedule your attendance at important meetings and training classes, since I am unable to confidently predict that you will be available when required. On numerous occasions ... your functional counterpart [in another department] inquired as to your work status. Workload planning/progress was impeded ... because of your absences. .... In short, your frequent unscheduled absences have resulted in an increasingly onerous burden for the organization and your colleagues.
>
> I must therefore inform you that, upon the exhaustion of your FMLA entitlement ..., I will no longer be able to approve LWOP requests. I need you to come to work. At the absolute minimum, I need you to be able to confidently predict almost all of your absences sufficiently in advance to allow for the scheduling of time-sensitive work projects, meetings, and training classes. (An occasional unplanned absence is acceptable, as it would be for any employee.) If this is not possible for you, I may be forced to take further action, possibly including removal from your position.

4. Kiburz took substantial amounts of leave from work due to his medical condition. Although the record does not have data for Kiburz's entire employment since his medical condition affected his work habits, we know that Kiburz had extended streaks of absences. For example, from June 21, 1999, to July 1, 2000, Kiburz used 727.5 hours of leave, approximately 4.5 months. From February 13, 2001, to October 19, 2001, Kiburz used another 718.5 hours of leave, approximately 4.4 months.

### Kiburz's Voluntary Retirement and his Second Board Appeal

In 2003, the Navy instituted a Voluntary Separation Incentive Payment program. The program permitted qualified Navy employees to voluntarily retire in exchange for $25,000. Kiburz was eligible for the program and retired on July 1, 2003. Four days later, on July 5, Kiburz filed a second Board appeal alleging that his voluntary retirement was a constructive discharge in violation of the Rehabilitation Act. Because the Board had not yet issued a final decision in Kiburz's first Board appeal, it dismissed Kiburz's second appeal without prejudice and granted him permission to re-file his appeal within fifteen days of the Board's final decision on his first appeal. Kiburz never re-filed his second appeal after the Board's final decision on the first appeal was issued on September 5, 2004. Instead, Kiburz sought relief in the federal courts.

### Procedural History

On October 13, 2004, Kiburz filed a complaint against the Navy in the United States District Court for the Middle District of Pennsylvania. He charged the Navy, under the Rehabilitation Act, with (1) discrimination and (2) constructive discharge for failing to accommodate his medical disability. After discovery, the Navy successfully moved for summary judgment on both counts.[5] Kiburz now brings this timely appeal.

## II.

Kiburz argues that the following constitute genuine issues of material fact: (1) whether the Navy accommodated Kiburz's request for a special chair; (2) whether Kiburz's request to work from home was reasonable; and (3) whether Kiburz's requests for a flexible work schedule in September 2000 and March 2001 were reasonable. These issues, he argues, preclude the entry of summary judgment for the Navy on his discrimination claim.[6] None of the purported genuine issues of material fact identified by Kiburz withstand scrutiny.

## A.

■ Kiburz claims that there is a genuine issue of material fact as to whether the Navy accommodated his request for a special chair that would mitigate his back pain. The undisputed facts establish that the Navy repeatedly attempted to find Kiburz an appropriate chair. First, Beecher asked Kiburz to pick out a chair that met Dr. MacKellar's specifications. Second, she sent Kiburz's own detailed description of a suitable chair to multiple vendors and brought in at least five chairs for Kiburz's

5. Prior to the end of discovery, the Navy moved for partial summary judgment on Kiburz's constructive discharge claim for failure to exhaust his administrative remedies. The Navy argued that Kiburz failed to exhaust the Board appeal process because Kiburz never pursued his constructive discharge claim with the Board. The District Court denied that motion.

6. "[T]o make out a prima facie case of discrimination under the Rehabilitation Act, the employee bears the burden of demonstrating (1) that ... she has a disability[;] (2) that ... she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that ... she was nonetheless terminated or otherwise prevented from performing the job." *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996). "The [employee] must [also] make a prima facie showing that reasonable accommodation is possible." *Id.* "If the [employee] is able to meet these burdens, the [employer] then bears the burden of proving, as an affirmative defense, that the accommodations requested by the [employee] are unreasonable, or would cause an undue hardship on the employer." *Id.*

review. Third, she had an outside occupational therapist conduct an ergonomic evaluation of Kiburz to assist in finding an appropriate chair. Fourth, Greenawalt assisted Kiburz in procuring a new chair immediately after he was reinstated by the Board in November 2002. After all those attempts, Kiburz finally chose a chair from a catalog that Greenawalt had given him. Kiburz's claim that he was not accommodated, despite the Navy conducting a search involving input from Kiburz, Dr. MacKellar, Beecher, an outside occupational therapist, and Greenawalt, is not supported by the record. Kiburz's position is meritless and we agree with the District Court that he "has failed to identify any evidence ... that suggests that the attempts by the Navy to accommodate him, albeit unsuccessful, were not reasonable."

### B.

■ Kiburz also argues that there are genuine issues of material fact as to whether his work from home request was reasonable. We disagree. The District Court correctly determined that Kiburz cannot complete essential functions of an IT Specialist, such as providing support, working with colleagues, and attending meetings and trainings, from home. Thus, his requested accommodation was unreasonable. *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir.2000) ("[E]mployers are not required to modify the essential functions of a job in order to accommodate an employee.").

To determine the essential functions of a job we look to numerous factors, including, but not limited to: (1) "[t]he employer's judgment as to which functions are essential"; (2) "[t]he amount of time spent on the job performing the function"; and (3) "[t]he consequences of not requiring the [employee] to perform the function." 29 C.F.R. § 1630.2(n)(3).[7]

The Navy's view of what constitutes an IT Specialist's essential functions can be gleaned from Kiburz's job description and his supervisors' directives. *See* 29 C.F.R. § 1630.2(n)(3)(i). These documents and communications show that working with others, attending work, meetings and trainings, and providing technical guidance, were all essential functions of Kiburz's position:

- Kiburz's job description made clear that his effectiveness would be judged in part by his "achievement of effective working relationships with customers[ ], assistants, and other coworkers."

- Ferguson stated in his October 31, 2001 letter that he "need[ed] [Kiburz] to come to work. At the absolute minimum, [Ferguson] need[ed] [Kiburz] to be able to confidently predict almost all of [his] absences sufficiently in advance to allow for the scheduling of time-sensitive work projects, meetings, and training classes."

- In the Supervisor's Statement portion of Kiburz's Request for Special Benefits for Health Reasons, Humphrey identified numerous "critical" tasks that Kiburz could not complete outside of the office. According to Humphrey, Kiburz's absence from the office "adversely impact[ed] all PD Elements and critical tasks including: responding to PTRs, participating in system

---

**7.** In the employment context, the standards from the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.*, should be used in determining whether the Rehabilitation Act has been violated. 29 U.S.C. § 794(d). Thus, we may look to the regulations implementing the equal employment provision of the ADA to provide general guidance on what is an "essential function" of a job.

requirement meetings, forecasting work completion, [and] providing technical guidance for emergent system requirements."

- Ferguson's declaration stated that Kiburz's job required "[w]orking with others, *e.g.*, Project Officers, Business System Designers, etc., and attending meetings—sometimes numerous meetings and, with some regularity, unplanned meetings—with various persons such as users, team members, other IT staff, and supervisors—to plan and carry out the IT work, resolve problems, allocate resources, and deal with many issues arising in the field of IT."

While perhaps some of these tasks could be completed from home, others, as the District Court correctly surmised, such as "training, scheduling [and attending meetings], and [providing] guidance [to other staff and managers]" could not.

The amount of time needed to perform the tasks that could only be completed in the office is fairly substantial. *See* 29 C.F.R. § 1630.2(n)(3)(iii). Kiburz attempted to downplay the amount of time spent performing these tasks in an affidavit where he stated that, at most, he spent approximately twenty percent of his time providing guidance to other staff and managers. But after adding in training, attending meetings, and responding to emergency situations, we conclude that these tasks collectively account for a substantial portion of Kiburz's total duties. Moreover, some of these tasks, like attending meetings and trainings, are prerequisites for being able to complete work that could be done individually at home. Thus, the nature and amount of work that can be

conducted from home is based on the completion of certain tasks in the office.

The negative consequences of not having Kiburz perform the tasks that could only be completed in the office, *see* 29 C.F.R. § 1630.2(n)(3)(iv), are also clearly established by the record. Looking at the effects Kiburz's absences have had in the past, it is evident that Kiburz's presence in the office is important to the success of his assigned projects. Indeed, according to Ferguson, Kiburz's "frequent unscheduled absences ... resulted in an increasingly onerous burden for the organization and [Kiburz's] colleagues."[8] Moreover, as explained in a memo pertaining to Kiburz's removal, Kiburz's inability to work in the office greatly impeded his work and harmed the Navy:

> On numerous occasions between 10 February and 19 October 2001, [Kiburz's] functional counterpart in Code 931 inquired as to his work status. Workload planning/progress was impeded because of his absences. Additionally, he could not be scheduled for work assignments, such as the lead for the RSupply Project, because of his inability to keep a regular work schedule. Numerous scheduled and unscheduled RSupply meetings were required. Also this project required numerous scheduled conference calls with our remote customers to effectively plan and deliver the project. Frequent cancellation of conference calls would impact the project schedule, product quality and [our organization's] professional reputation. This reassignment of work precluded [the organization] from completing other funded projects for our customers.

In addition, the memo explained that Kiburz's absences decreased his relevant IT

---

8. In the October 31, 2001 letter from Ferguson to Kiburz, Ferguson explained that he often had to assign Kiburz's work "to other

subordinates to assure timely completion" due to Kiburz's unpredictable absences from the office.

skillset because he missed hundreds of hours of training:

> [Kiburz's colleagues] averaged 90 hours of training each year in FY01, FY00, FY99 and FY98. During the same timeframe ... Kiburz completed one sixteen hour and two four hour technical courses. His inability to attend 30 to 40 hour training sessions limits his ability to maintain the necessary skills required in today's environment and creates excessive training costs (empty class seats) for the Command. As a result, [Kiburz's] assignments are limited to legacy (dated technology) systems that are being phased out by the Navy.

In sum, the negative consequences of Kiburz's prior absences from the office show that working from home would limit Kiburz's utility as an employee because he would be unavailable for projects requiring a regular work schedule, unscheduled meetings, or conference calls. His inability to attend trainings would limit his relevant IT skillset, rendering him increasingly useless to his employer as legacy systems are phased out.

All of these facts establish that Kiburz's presence in the office was necessary to perform essential functions of his job. Thus, we agree with the District Court's determination that "Kiburz could not perform all of the essential functions of his job without his regular, physical presence in the workplace." [9]

■ In addition, we agree with the District Court's further determination that "even if the accommodation had been reasonable, the record [shows] that Kiburz could not demonstrate that he was 'otherwise qualified to perform the essential functions of the job.'" Dr. MacKellar and Kiburz both stated that Kiburz suffered from unpredictable episodes of severe pain that would require him to remain immobile for periods of time.[10] Kiburz cannot work during those episodes of pain even with his proposed accommodation of working from home. Kiburz, himself, admitted in his Statement of Disability in Connection with Request for Special Benefits for Health Reasons that even if he was permitted to work from home, he "most likely wouldn't be able to perform all [of his] work because of the pain from the arthritis." Based on these facts, we conclude that Kiburz could not carry out the essential functions of an IT Specialist with or without the accommodation of being able to work from home. *See Shiring*, 90 F.3d at 831.

## C.

■ Kiburz's argument that the September 2000 and March 2001 flexible work

9. Kiburz's observation that other Navy employees were permitted to work from home is not relevant to his discrimination claim. There is no evidence showing that those employees performed the same essential functions as Kiburz or had comparable medical conditions. The mere fact that others were permitted to work from home, standing alone, does not permit Kiburz to survive summary judgment.

10. In an August 11, 2000 letter to the Navy, Dr. MacKellar stated that:

> Due to [Kiburz's] persistent and continued severe episodes of pain, it is my recommendation that work schedules be extremely flexible for ... Kiburz. In a completely

> flexible work environment, he *may* be able to function. *However, he will have periods of time where he is unable to work* [.]

(emphasis added). Kiburz described his medical condition similarly in his Statement of Disability in Connection with Request for Special Benefits for Health Reasons:

> I have arthritis of the spine which gives me great pain when I stand, walk or sit. *Some days any movement of the spine causes me enough pain that I am unable to come into work and I spend most of the day in bed or in a recliner chair moving as little as possible.*

(emphasis added).

schedule requests raise genuine issues of material fact also fails. According to Kiburz, the denial of the September 2000 flexible work schedule request was suspect because Humphrey denied the request citing lack of knowledge regarding the workload for a project without explaining why the workload may change. We disagree with Kiburz's assertion that Humphrey's failure to explain why the workload may change creates a genuine issue of material fact. At best, Kiburz's purported genuine issue of material fact amounts to mere speculation that there was no potential for a changed workload and that Humphrey was denying Kiburz's request for other, discriminatory reasons. "[S]peculation and conjecture[, however,] may not defeat a motion for summary judgment." *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 228 (3d Cir.2009) (citing *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 332–33 (3d Cir.2005)); *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir.1990).

Additionally, while Humphrey did not explain why the workload may change, he also did not summarily reject Kiburz's request without explanation. Humphrey noted, in an October 4, 2000 e-mail, that Kiburz's flexible work schedule request could not be granted because "[t]he FY01 workload for application 'O' ha[d] not been identified[.]" More importantly, that rejection was not the end of the matter. Humphrey suggested in the same e-mail that Kiburz "resubmit [his] request for further consideration" when "the FY01 application 'O' workload [wa]s identified." Kiburz neither resubmitted his request nor questioned Humphrey's reasoning in denying his request.

■ The March 2001 request also fails to raise a genuine issue of material fact. In that request, Kiburz proposed a schedule that would permit him to arrive at and depart from the office anytime between 6:30 a.m. and 10:30 p.m. Ferguson responded to this request with a proposed flexible work schedule similar to Kiburz's September 1999 schedule, permitting arrival and departure windows of 6:30 a.m. to 11:00 a.m. and 3:00 p.m. to 7:30 p.m., respectively. Kiburz rejected Ferguson's proposal, claiming that it would "only reduce [his] use of LWOP by a few hours each pay period." Assuming Kiburz was correct, the fact that his LWOP would only decrease by a few hours each pay period did not render the accommodation unreasonable and worthy of his rejection. Ferguson's proposal permitted Kiburz flexibility to manage his medical condition while maintaining his work performance.

Kiburz's proposed schedule, on the other hand, would have only condoned his unpredictable absences and thus, was unreasonable for all the same reasons as his proposal to work from home. Kiburz's attendance during normal work hours is important to the completion of essential functions of his job. His proposed schedule would permit him to come and go anytime during the day, over a 16–hour period. In short, Kiburz's proposed schedule would require "modify[ing] the essential functions of [an IT Specialist]" in order to accommodate [Kiburz]," *Donahue*, 224 F.3d at 232, and the Navy is under no legal obligation to do so. *Id.*

### III.

■ Kiburz argues that his constructive discharge claim[11] was based on the

---

11. The test applied to constructive discharge claims is objective, and turns on "whether a reasonable jury could conclude that [the Navy] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Connors v. Chrysler*

Navy's continuing failure to accommodate his disability after the Board reinstated his employment. The facts do not support Kiburz's argument.[12] First, Kiburz voluntarily retired from the Navy. Indeed, he received $25,000 in exchange for his early retirement. Second, Kiburz did not produce any evidence showing that his work environment was intolerable. His assertions of a convoluted accommodation request process, even if true, are a far cry from cases where we have concluded that an employee was constructively discharged. *E.g., Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084–85 (3d Cir.1996) (reversing summary judgment for employer where employee was subjected to racially-based insults and prevented from doing her job). At the time of his purported constructive discharge, Kiburz was not "threatened with discharge; nor did [the Navy] ever urge or suggest that [h]e resign or retire." *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir.1993) (reversing judgment for plaintiff on constructive discharge claim under the Age Discrimination in Employment Act). Kiburz was also never demoted, transferred to a less desirable position, or subjected to reduced pay or benefits. *Id.* Third, Greenawalt accommodated Kiburz's only request after he was reinstated to his position by the Board—the request for a special chair.

Given these facts, we agree with the District Court that "there is no evidence of intolerable conditions sufficient to constitute a constructive discharge." Although we sympathize with Kiburz's chronic and painful medical condition, even an intolerably painful medical condition does not give rise to a claim for constructive discharge. The conditions of the work environment itself must be intolerable and Kiburz has produced no evidence to meet such a requirement. Accordingly, we reject Kiburz's contention that he was constructively discharged.

## IV.

Kiburz has failed to show that there were any genuine issues of material fact precluding the District Court's grant of summary judgment for the Navy. Accordingly, we will affirm the District Court's order.

---

*Fin. Corp.*, 160 F.3d 971, 974 (3d Cir.1998) (citing *Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 173 (3d Cir.1988)). In other words, the conditions must have been objectively "intolerable." *Spangle*, 839 F.2d at 173. "Intolerability" is a fairly high standard. It requires a showing that a reasonable person in the employee's position would feel like she had "no choice but to resign":

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather, "intoler-

ability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,"—that is, whether he would have had no choice but to resign. *Connors*, 160 F.3d at 976 (quoting *Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996) (citations omitted)).

**12.** Kiburz also argues, based on Ferguson's e-mails to Navy officials, that Ferguson did not like Kiburz and did not want Kiburz to return to work under his supervision. What Ferguson thought of Kiburz is irrelevant to Kiburz's constructive discharge claim, which turns on whether the latter's work conditions were objectively intolerable. *See Connors*, 160 F.3d at 976.